In the
United States Court of Appeals
For the Seventh Circuit

No. 99-3175

Daniel Alvarez, Sr.,

Petitioner-Appellant,

v.

William E. Boyd,

Respondent-Appellee.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 98 C 8338--Ruben Castillo, Judge.

Argued March 28, 2000--Decided August 29, 2000

Before Easterbrook, Manion, and Evans, Circuit Judges.

Manion, Circuit Judge.  At 7:00 a.m. on December 14, 1993 Alicia Godina, while walking to a commuter train, was attacked and severely stabbed. She identified Daniel Alvarez, a former boyfriend, as the attacker. However, Alvarez not only denied it and presented a plausible alibi, but also the only eyewitness to the attack said Alvarez was not the perpetrator. Nevertheless, an Illinois jury convicted him of attempted first-degree murder. He was sentenced to forty years in prison. Alvarez brought this sec. 2254 motion, arguing that the cumulative effect of two evidentiary rulings denied him a fair trial. The district court denied relief but granted a certificate of appealability. This was a close case with each side presenting very conflicting evidence. Nevertheless, a jury resolved the difficult questions and found him guilty. We conclude he received a fair trial, and so we affirm.

I.

On the morning of December 14, 1993, Alicia Godina was on her way to work following the usual route from her house to the train station in her Chicago neighborhood along East 93rd Street. She testified that shortly after she left her house at 6:55 a.m., she heard someone behind her. When she turned around she saw her ex-boyfriend--

Daniel Alvarez. He was holding a knife, which he then used to stab her. Godina testified that Alvarez temporarily halted the attack when a man yelled at him to stop. According to her, Alvarez ran after the man, but soon returned, got on top of Godina and began to cut her throat. She said that she closed her eyes and feigned death, at which time Alvarez ran away.

A nurse from the emergency room testified that Godina suffered multiple stab wounds to her neck, chest, abdomen, and wrists. When she arrived at the hospital she was close to death: because the knife had penetrated her heart, she had only a faint heartbeat and only minimal blood pressure. Yet apparently she was conscious at some point because she informed a nurse (without mentioning any names) that her "ex-boyfriend" had attacked her. Godina underwent emergency surgery, without anesthesia because of her faint heartbeat, and eventually recovered from the attack.

Because of Godina's accusation, the police went looking for Alvarez. About 2:00 p.m. on the day of the attack, a small band of officers went to his parents' house where he lived. Alvarez was there and he identified himself, invited the officers into the house, and consented to a search of the house and his van. The police did not find any physical evidence linking Alvarez to the crime. Nevertheless, based on Godina's accusation, they took Alvarez down to the police station for questioning. A grand jury eventually indicted Alvarez on one count of attempted first-degree murder, three counts of armed violence, and four counts of aggravated battery. Most of the charges were eventually dismissed, but Alvarez was tried by a jury for attempted first-degree murder.

At trial, the jury heard Godina's version of the attack and also learned about her prior relationship with Alvarez. Godina testified that she started dating Alvarez when she was fourteen years old, and they dated for about three and one-half years. Godina characterized Alvarez as jealous and possessive, particularly after she broke off the relationship in June 1993. She described Alvarez as unhappy with the breakup, although they both moved on and occasionally met for lunch. Godina regularly took a Metra train to downtown Chicago, and she told the jury that on four occasions Alvarez followed her onto the train, although she admitted that this might have been a coincidence, as Alvarez also took the same train to and from his job in downtown Chicago. She testified that after August 25, 1993, she did not again see Alvarez until the attack on December 13.

The prosecution's case was necessarily brief, as it centered on Godina's testimony. The defense's star witness was Peter Thompson, who was the only person to see the stabbing other than the victim and the attacker. Thompson testified that he was leaving his house on his way to work when he saw the assailant first follow and then attack Godina. Thompson was only about three or four feet from them during part of the attack. When the attacker saw Thompson, they faced each other and briefly made eye contact before Thompson went to his car to obtain a bat, whereupon the attacker ran away. Thompson testified that he looked closely at the assailant, that he remembered his facial features, hair color, mustache, build, and height. Although at some point he was not certain he could identify the attacker, he was positive that Alvarez was not the man who stabbed Godina. Thompson also related that, although the police interviewed him, they never showed him photographs of Alvarez or any other suspects, and never got around to having him view a lineup of suspects. Thompson claimed he knew neither Godina nor Alvarez, and thus apparently had no motive to lie. He also lent some support to the defense's theory that Godina's memory of the attack may have been faulty, as he testified that he never yelled at the attacker to stop, as Godina's testimony indicated.

Other testimony also gave reason to believe that Alvarez may not have been the attacker. Alvarez testified that on the morning of the assault he was at Peggy's Restaurant, a small diner near the Royal Crown Cola plant where he had a job interview. While no witness fully corroborated Alvarez's testimony about being at the restaurant during the attack, several Royal Crown employees testified that Alvarez showed up for an interview at their plant at 47th Street and California Street between 6:15 and 6:30 a.m. Because the trucks needed to be dispatched, he was told to return around 7:30 a.m. According to Alvarez, he went to the restaurant to have something to eat, and returned to the Royal Crown plant around 7:40. Royal Crown employees confirmed that Alvarez returned to the plant between 7:30 and 8:00 a.m. This narrow space of time raises some troubling questions. It gave Alvarez, at most, one hour and forty-five minutes to drive from the Royal Crown plant to the scene of the attack. The timing had to be precise. He had to drive from Royal Crown to the crime scene, park his van, stalk and stab Godina, flee to his van, ditch the knife, perhaps clean up any blood and ensure that he did not leave any traces in the van, and drive back to the plant and look presentable at the interview. And all this during peak driving times.

A private investigator testified that, based on two experiments driving the route, to travel the approximate fifteen miles between the Royal Crown plant and the site of the attack at East 93rd Street would have taken forty-three minutes, assuming the driver traveled the speed limit and used the Dan Ryan Expressway during non-peak driving times. A state investigator testified that he made the drive from the plant to the attack site in as little as twenty-eight minutes during non-peak times, and thirty-seven minutes during rush hour. Because the attack occurred around 7:00, and the undisputed testimony was that Alvarez was at the plant no earlier than 6:15, it would have been difficult for him to have committed the crime. True, the attack might have occurred as late as 7:10 or possibly even 7:15, but if that's the case, it would have been extremely difficult for Alvarez to make it back to the Royal Crown plant by 7:40.

Alvarez's case is also striking by its contrast. He doesn't fit the profile of violent offenders often in this court. The jury and sentencing judge heard that he had no juvenile record or history of violence, and that he came from a stable, two-parent home where he still lived. Alvarez completed high school with a respectable GPA, and while a student he participated in sports and received awards for perfect attendance. Alvarez also earned an associate's degree in computer business systems and accounting. He had a good work record, and had no arrests or convictions, even for minor crimes. He is not a member of a gang and there is no indication that he used drugs or drank to excess. Furthermore, his relationship with Godina was not sexual or passionate, and their "dates" usually consisted of sitting on the front porch of her home. Although he was apparently upset after she broke off the relationship, within a week of their breakup they both were dating other people. Thus, the prosecution's attempt to paint Alvarez as the jealous and jilted ex-boyfriend was less than stellar. Nevertheless, Godina was adamant that Alvarez was the attacker. For whatever reasons the jury found most compelling, it convicted Alvarez of attempted first-degree murder. The judge sentenced Alvarez to forty years imprisonment. The Illinois Court of Appeals affirmed his conviction, People v. Alvarez, No. 94 CR 548-01 (Ill. App. Ct. 1997), and the Illinois Supreme Court rejected his petition for leave to appeal. People v. Alvarez, 686 N.E.2d 1164 (Ill. 1997).

Alvarez filed this sec. 2254 motion, asserting four grounds for relief. First, Alvarez contended that he was denied his right to confront adverse

witnesses because the trial court declined to let him cross-examine Godina about her tendency to faint. The district court concluded that no constitutional error occurred because this line of questioning was not particularly relevant, and that any error was harmless. Alvarez v. O'Sullivan, 58 F. Supp.2d 882, 886, 887 (N.D. Ill. 1999). Second, Alvarez argued that the trial court denied him the right to present a defense by excluding Thompson's pretrial statement that the defendant was not the attacker. The district court held that this was hearsay that was not subject to any exception, and thus the district court did not err in excluding it. Also, even if it were an error, the error was harmless. Id. at 887, 888. Alvarez then argued that, even if these two errors could not be considered prejudicial when considered separately, their cumulative effect was to deny him a fair trial in violation of the Due Process Clause of the Fourteenth Amendment. The district court rejected this argument because Alvarez had to show that there were at least two trial errors, but he failed to demonstrate that there was even one. Id. at 888. His fourth argument was that there was insufficient evidence to support the conviction, which the district court quickly dispatched based on Godina's testimony that we recounted above. Id. at 889. Alvarez sought from the district court a certificate of appealability as to all four claims, but the district court granted one only as to Alvarez's cumulative effect argument, which is, therefore, the only issue on appeal.

II.

To prevail on his Section 2254 motion, Alvarez must show that a decision by the Illinois state courts "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. sec. 2254(d)(1) & (2); see Williams v. Taylor, 120 S. Ct. 1495, 1521 (2000).

Trial errors which in isolation are harmless might, when aggregated, alter the course of a trial so as to violate a petitioner's right to due process of law. Taylor v. Kentucky, 436 U.S. 478, 487 n.15 (1978); United States v. Santos, 201 F.3d 953, 965 (7th Cir. 2000); United States v. Haddon, 927 F.2d 942, 949 (7th Cir. 1991)./1 "The cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error." United States v. Rivera, 900 F.2d 1462, 1469 (10th Cir. 1990) (en banc); United States v. Rogers, 89 F.3d 1326,

1338 (7th Cir. 1996). To prevent the synergistic effect of these errors from escaping review, courts attempt to determine whether the whole is greater than the sum of its parts. The cumulative effect analysis requires a petitioner to establish two elements: (1) at least two errors were committed in the course of the trial; (2) considered together, along with the entire record, the multiple errors so infected the jury's deliberation that they denied the petitioner a fundamentally fair trial. Jackson v. Johnson, 194 F.3d 641, 655 n.59 (5th Cir. 1999); United States v. Copple, 24 F.3d 535, 547 n.17 (3d Cir. 1994); Rivera, 900 F.2d at 1471 n.11.

As to the first prong (were there two errors), if there was no error, or just a single error, there are no ill effects to accumulate and so a petitioner in such a case could not prevail on this theory. Van Woudenberg ex rel. Foor v. Gibson, 211 F.3d 560, 571 (10th Cir. 2000); United States v. Stokes, 124 F.3d 39, 43 (1st Cir. 1997); United States v. Akinsanya, 53 F.3d 852, 859 (7th Cir. 1995). Courts will consider only plain errors or errors which were preserved for appellate review. United States v. Munoz, 150 F.3d 401, 418 (5th Cir. 1998); United States v. Necoechea, 986 F.2d 1273, 1282 (9th Cir. 1993). As to the second prong (cumulative errors affected fundamental fairness), the Constitution entitles the petitioner to a fair trial, not a perfect one. Rose v. Clark, 478 U.S. 570, 579 (1986); Rogers, 89 F.3d at 1338. And courts must be careful not to magnify the significance of errors which had little importance in the trial setting. United States v. Ward, 190 F.3d 483, 491 (6th Cir. 1999). This requires an examination of the entire record, paying particular attention to the nature and number of alleged errors committed; their interrelationship, if any, and their combined effect; how the trial court dealt with the errors, including the efficacy of any remedial measures; and the strength of the prosecution's case. United States v. Fernandez, 145 F.3d 59, 66 (1st Cir. 1998); United States v. Thomas, 93 F.3d 479, 487 (8th Cir. 1996); United States v. Frederick, 78 F.3d 1370, 1381 (9th Cir. 1996); Haddon, 927 F.3d at 949. To warrant relief, the reviewing court must determine that the effect of the errors, considered together, could not have been harmless. United States v. Oberle, 136 F.3d 1414, 1423 (10th Cir. 1998). Put another way, a court must be firmly convinced that but for the errors, the outcome of the trial probably would have been different. Santos, 201 F.3d at 965; United States v. Thornton, 1 F.3d 149, 156 (3d Cir. 1993); Solles v. Israel, 868 F.2d 242, 248 (7th Cir. 1989) (prosecutorial misconduct).

As the district court noted, Alvarez cannot prevail on his cumulative effect argument because he failed to show that there was even a single error, much less two. The district court's opinion adequately explains why questions about Godina's purported tendency to faint is not relevant. She did not faint as a result of the stabbing, and other unrelated fainting incidents would have no indication that she would or would not have fainted during the attack. We only add that the result might have been different if Alvarez had also offered evidence that fainting has a correlation with faulty memory or delusions. Because no such evidence was tendered, her propensity to lose consciousness was irrelevant. As to the trial court's decision to exclude Thompson's prior statement that Alvarez was not the assailant, Alvarez has not demonstrated that this was not hearsay, or that an exception to the hearsay rule is applicable. Moreover, he hasn't overcome a second, perhaps more compelling ground for exclusion: the fact that the statement would have been cumulative of Thompson's nearly identical trial testimony. Thompson was unequivocal in his assertion that Alvarez was not the attacker. There was no evidence that he told anyone something different. Because Alvarez has not shown that the testimony was admissible, he cannot show that the trial court committed at least two errors. And without establishing the requisite two errors, Alvarez cannot prevail on a cumulative effect claim.

Furthermore, even if Alvarez had established the existence of two trial errors, we would not say that the cumulative effect of the district court's decisions denied him a fair trial. For largely the same reasons that these decisions were not errors, they could not have caused Alvarez prejudice. Thus, even if Alvarez had elicited testimony from Godina that she had a tendency to faint, this wouldn't have helped Alvarez's case because he was not going to present evidence that fainting causes mistaken memories. Thus, simply preventing the jury from hearing that Godina occasionally loses consciousness did not harm Alvarez's case. Similarly, because the jury heard first-hand Thompson's adamant assertion that Alvarez was not the attacker, testimony about Thompson previously making the same assertion would have produced little benefit for Alvarez that he didn't already enjoy. Indeed, any added advantage would have been so minimal that Alvarez can hardly say that being denied this testimony, along with the testimony about Godina's fainting, denied him a fair trial. This is true even though the evidence against Alvarez, taken together, was far from overwhelming.

III.

The sharply conflicting testimony of Godina on the one hand and Alvarez and Thompson on the other, coupled with other conflicts of timing and motive, do make this a close, even troubling case. The time span between Alvarez's first and second visits at the Royal Crown Cola plant was so narrow that the attack had to be precisely executed. This, along with Thompson's insistence that Alvarez was not the attacker and the investigators' inability to find any corroborative evidence linking Alvarez to the crime scene, adds to the mystery. But Godina's testimony was unwavering and as long as the trial was fair, this court must rely on the jury, not the cold record, to resolve questions of witness credibility and conflicting evidence.

Alvarez has failed to show that the trial court committed any errors in excluding testimony. Because he cannot show that he suffered the effects of multiple errors, he cannot avail himself of the cumulative error analysis. Alvarez received a fair trial, and the decision of the district court to deny Alvarez's sec. 2254 petition is AFFIRMED.

/1 One circuit has held that the cumulative effect of trial errors does not provide a basis for relief in a sec. 2254 motion. Wainwright v. Lockhart, 80 F.3d 1226, 1233 (8th Cir. 1996) ("errors that are not unconstitutional individually cannot be added together to create a constitutional violation"). Because neither party has addressed this issue, however, we do not consider it.