In the
United States Court of Appeals
For the Seventh Circuit

No. 99-4246

Jerome L. Anderson,

Petitioner-Appellant,

v.

Jerry Sternes, Warden,

Respondent-Appellee.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern
Division.
No. 95 C 6864--David H. Coar, Judge.

Argued September 12, 2000--Decided March 15,
2001

Before Posner, Coffey, and Manion, Circuit
Judges.

Manion, Circuit Judge.  Jerome Anderson
was convicted in Illinois state court of
two counts of attempted murder and one
count of aggravated battery. After
exhausting his state court remedies,
Anderson filed a petition for habeas
corpus arguing that he was denied due
process and that he received ineffective
assistance of counsel. The district court
denied Anderson's petition for habeas
relief. We affirm.

I.  Background

On March 2, 1990 at about 8:40 p.m.,
Chicago police officers Richard Mitchell
and Johnny Patterson were patrolling the
Chicago Housing Authority residences
located on South Federal Street in
Chicago, Illinois. They were in plain
clothes and driving an unmarked car. As
they drove by one of the buildings, they
saw a large group of men standing in the
breezeway of the building located at 3919
South Federal. They parked their car
about one block away and then began

walking toward the men. When they were approximately four to five feet away from a then-unknown individual (later identified as Jerome Anderson), Officer Patterson announced "police officers." Anderson began to run, but as he was fleeing he turned and fired at Officers Mitchell and Patterson. Patterson was shot twice, once in the leg and once in the chest, but the shots missed Mitchell. Officer Mitchell radioed for assistance and for an ambulance for Officer Patterson.

Several officers responded to the scene, including Officer Mitchell McCullough, a gang specialist for the Chicago Police Department who had been patrolling the area. Officer Cummings also responded to the call, and he obtained a description of the assailant from Officer Mitchell. Officer Mitchell described the shooter as between 16 - 20 years old, about six feet tall, 150 pounds, with no facial hair. Later that evening back at the police station, Officer Mitchell identified Jerome Anderson as the shooter from an array of pictures.

The following day the police went to Anderson's girlfriend's apartment to arrest him. Anderson attempted to flee, jumping out of the second-floor bedroom window, but the police caught him before he could get away. They then searched the apartment, seizing a .22 caliber rifle, a rifle scope, a box of .380 automatic bullets, ten loose .380 bullets, nine .38 special bullets, a loaded .45 caliber pistol, a clip with six .45 caliber live rounds, and one box of .45 caliber bullets. However, they did not find the .38 caliber pistol believed to have been used to shoot Officer Patterson. After he was arrested Anderson was placed in a line-up, and Officer Mitchell once again identified him as the shooter. However, contrary to Officer Mitchell's original description, Anderson had some facial hair and gave his weight at 210 pounds.

Based on Officer Mitchell's identification, Jerome Anderson was indicted on two counts of attempted first-degree murder and one count of aggravated battery. He pleaded not guilty and proceeded to trial in Illinois state court. At trial, Anderson claimed that he had never been to 3919 South Federal and had not shot Officer Patterson. He also

testified that he fled from his girlfriend's apartment because he heard intruders forcing their way in downstairs and he was afraid; he claimed that he did not know it was the police seeking entry.

Officer McCullough contradicted Anderson's testimony, stating that he had seen Anderson at 3919 South Federal on at least three occasions. The jury also learned that Officer Mitchell had identified Anderson from a photo array and a line-up, and Officer Mitchell again identified Anderson in court as the shooter. Officer Patterson also testified as to the events on the evening of March 2, 1990, and he identified Anderson as the shooter, stating that he got a good look at Anderson from a distance of only four to five feet. In addition to the in-court identification, Patterson testified that the previous day he had identified Anderson from a photo array of six individuals and also from a photograph of the line-up conducted with Anderson. The State of Illinois also presented a stipulation from an expert that a spent bullet recovered from the area was "a .38 caliber bullet, a .38 special," and the jury heard testimony that at the time he was arrested, Anderson possessed bullets for a .38 special but no matching gun, whereas he had a .45 caliber pistol and ammunition for it.

Based on this and other testimony, the jury found Anderson guilty of two counts of attempted first-degree murder and one count of aggravated battery, and he was sentenced to prison terms of 40 years and 10 years, to be served consecutively. Anderson appealed to the Illinois Appellate Court First District, which affirmed his conviction, and then he sought review by the Illinois Supreme Court, which denied his request for leave to appeal. After exhausting his state law appeals, Anderson filed a petition for habeas corpus in the district court. Anderson argued that he had been denied his right to due process because the state court had improperly admitted evidence of the weapons seized from his girlfriend's apartment, and that it erred in allowing Officer McCullough to be identified as a gang specialist. Anderson also objected to a statement made by Officer McCullough that the photos used in a photo array were of "persons that had been arrested in the past." Finally,

Anderson claimed that he was denied effective assistance of counsel because his attorney failed to seek limiting instructions for the above evidence. The district court denied Anderson's petition for habeas relief, and he appeals.

II.  Analysis
A. Due Process

Anderson contends that he was denied his right to due process because the jury improperly heard the three pieces of evidence set forth above. Initially, it is important to note that state court evidentiary errors do not normally entitle a defendant to habeas relief. Rather, habeas relief is appropriate only if the erroneous evidentiary rulings were

so prejudicial that [they] compromise[d] the petitioner's due process right to a fundamentally fair trial. This means that the error must have produced a significant likelihood that an innocent person has been convicted. Indeed, because of this high standard, evidentiary questions are generally not subject to review in habeas corpus proceedings.

Howard v. O'Sullivan, 185 F.3d 721, 723-24 (7th Cir. 1999). Moreover, "courts must be careful not to magnify the significance of errors which had little importance in the trial setting." Alvarez v. Boyd, 225 F.3d 820, 825 (7th Cir. 2000). To consider the significance of the alleged errors, a court must examine "the entire record, paying particular attention to the nature and number of alleged errors committed; their interrelationship, if any, and their combined effect; how the trial court dealt with the errors, including the efficacy of any remedial measures; and the strength of the prosecution's case." Id. Against this background, we consider each of Anderson's evidentiary challenges to determine if an error existed and, if so, whether it reached the level of a due process violation.

First, Anderson contends that testimony by Officer McCullough that he was a gang specialist was improperly admitted. In support of his position, Anderson cites cases holding that evidence that a defendant is a gang member is inadmissible. While that is true, there

was no testimony in this case that Anderson was a member of a gang or that the shooting was gang-related. Rather, Officer McCullough merely informed the jury of his title with the Chicago Police Department, just as the other testifying police officers did. Given the limited nature of the comment and the fact that the prosecution in no way tried to characterize Anderson as a gang member or the crime as gang-related, we do not believe that the passing references to Officer McCullough as a gang specialist were improper. Because there was no error, this testimony does not implicate Anderson's due process rights. See, e.g., United States v. Hall, 109 F.3d 1227, 1232 (7th Cir. 1997) (passing reference to defendant's gang membership did not have a "substantial and injurious effect or influence on the jury's verdict").

Anderson next challenges a statement made by Officer McCullough during direct examination. Specifically, in questioning Officer McCullough concerning Officer Mitchell's identification of Anderson from the photo array that Officer McCullough had shown him, the prosecution requested that Officer McCullough look at the photo array, and then asked him what it was, to which he responded that "these are police photos of persons that had been arrested in the past."

The law is clear that a defendant's prior arrest record is inadmissible, and while the reference to Anderson's past arrest was only indirect, it was still improper. Yet not every evidentiary error constitutes a denial of due process. Rather, the question is whether the error produced a significant likelihood that an innocent person has been convicted. Howard, 185 F.3d at 723-24. Given that this was a passing reference and that the prosecution did not focus on it either during questioning or in closing arguments, we conclude that this reference did not affect the jury verdict.

Finally, Anderson argues that he was denied due process because the prosecution presented evidence that at the time he was arrested, the police seized other weapons. Granted, the mere presence of weapons during an arrest is irrelevant. Yet, the presence of a .45 caliber pistol and ammunition seized was

relevant to the government's theory that Anderson also owned a .38 caliber pistol--the type believed to have been used to shoot Officer Patterson--but that Anderson disposed of it before his arrest. The prosecution showed that Anderson owned the .45 caliber pistol as well as ammunition for it. But although the police officers found .38 caliber ammunition in the apartment, they did not find the .38 caliber weapon that used that ammunition. Since the evidence indicated that the bullet which hit Officer Patterson was .38 caliber, this furthered the government's theory that Anderson disposed of the weapon used to shoot him. As for the rifle, Anderson claimed that he did not own the rifle, while he admitted that he owned the .45 caliber pistol. It is hard to see what prejudice could result from the mention of a weapon Anderson did not own. Along with the rifle, police found an attachable scope. This could have added some weight to the government's theory that Anderson would not possess .38 caliber ammunition unless he had recently owned a weapon that could use the ammunition.

The presence of the weapons in the apartment was relevant for another reason: Anderson testified that he jumped out of the second-story window of his girlfriend's apartment because he heard people forcing themselves into the apartment and he was afraid; he claims he did not know it was the police. But Anderson also testified that when he fled he left behind his girlfriend and her young niece and nephew, notwithstanding that he had within arm's reach a loaded weapon, which he claimed he kept for protection. The existence of the weapons was thus relevant in that it called into question Anderson's explanation as to why he possessed them in the first place, and if so why he fled. The contradiction made it more likely that he took flight because he knew the police were after him for shooting Patterson.

Still, relevant evidence may be inadmissible if the unfair prejudice stemming from its admission substantially outweighs its probative value. If we were to do the balance, we would be hard pressed to conclude that the probative value flowing from the admitted weapons and ammunition was substantially

outweighed by unfair prejudice, especially since in discussing the weapons during trial and in closing argument, the government focused only on its theory about the relevance of the weapons; the government did not argue that Anderson was a bad person because he kept guns, just that Anderson would likely not have had ammunition for a .38 caliber weapon without also owning one that used that caliber of bullets. Nor would Anderson have fled out of fear of an intruder, leaving two small children alone and unprotected, when he had a loaded weapon supposedly kept to protect himself and other occupants of the apartment. But in any event, in a habeas challenge any alleged error must amount to a constitutional infirmity. At this stage it is not this court's duty to balance the probative value against the unfair prejudice because "the Due Process Clause does not permit federal courts to 'engage in a finely tuned review of the wisdom of state evidentiary rules.'" Morgan v. Krenke, 232 F.3d 562 (7th Cir. 2000) (quoting Patterson v. New York, 432 U.S. 197 (1977)). Rather, we must consider whether the alleged unfair prejudice stemming from this evidence firmly convinces us "that but for the errors, the outcome of the trial probably would have been different," thus denying the petitioner his due process right to a fundamentally fair trial. Alvarez, 225 F.3d at 825. Given the government's focus on its theory of the case (rather than the mere fact that Anderson owned guns), we conclude that any unfair prejudice does not call into question the jury verdict. Therefore, the inclusion of this evidence also did not create a due process violation.

Anderson also contends that even if each of these evidentiary errors, individually, did not violate his due process rights, the cumulative effect of the errors did. Anderson is correct that while individual errors may not affect a defendant's due process rights, the synergy of those errors could. Alvarez, 225 F.3d at 824 ("Trial errors which in isolation are harmless might, when aggregated, alter the course of a trial so as to violate a petitioner's right to due process of law."). But even considered together, the admission of these three pieces of evidence (assuming their admission was erroneous) does not

undermine the validity of the jury's verdict because the challenged evidence constituted a minor portion of the government's case, which rested mainly on the positive identification of the two police officer victims, coupled with Anderson's flight from the police and his possession of .38 caliber bullets. See, e.g., United States v. Rogers, 89 F.3d 1326, 1338 (7th Cir. 1996) ("The Constitution entitles a criminal defendant to a fair trial, not a perfect one and we will not upset a guilty verdict where the record fairly demonstrates the defendant's guilt such that none of the asserted errors, either individually or cumulatively, could possibly have influenced the jury to reach an improper result.").

Moreover, in attempting to discredit the jury verdict, Anderson does not explain how these three errors combined to improperly influence the jury. Rather, Anderson attacks the credibility of Officers Patterson and Mitchell's identification of him as the shooter. Specifically, Anderson attempts to call the jury verdict into question by focusing on the discrepancies between Officer Mitchell's original description of the shooter and Anderson's actual appearance, and by challenging the reliability of eyewitness identifications in general. But Anderson does not contend that the state court improperly admitted Officers Patterson and Mitchell's testimony and identifications. Nor does he assert that the admissibility of these eyewitness identifications somehow violated his due process rights. Because Anderson does not challenge the admissibility or the constitutionality of the eyewitnesses' evidence, he cannot use the alleged discrepancies with the identifications (which are really nothing more than credibility issues) to turn unrelated evidentiary errors (i.e., the guns, gang specialist title, and past criminal record comment) into denials of due process.

When considering whether a due process violation entitles a defendant to habeas relief the court will consider the remaining evidence to determine whether the improperly admitted evidence calls into question the jury verdict. Alvarez, 225 F.3d at 825. But that does not entitle a federal court to retry a case.

The jury in this case heard about all of the questions regarding eyewitness identifications. It also learned that Officer Mitchell's original description of the shooter did not mesh with Anderson's appearance when he was arrested the next day, including the fact that Officer Mitchell had stated that the shooter was clean-shaven, but that Anderson's arrest photograph showed him with facial hair. But the jury also had before it the photograph of Anderson taken at the time of his arrest and thus it could gauge for itself the amount of facial hair Anderson actually had, and whether--given time for another day's growth--it would have been noticeable the night before when Officer Mitchell described Anderson as clean-shaven. The record, on the other hand, inexplicably does not contain a copy of the photograph, so we have no way of comparing how far off Officer Mitchell's description was from Anderson's appearance. On the cold record it may seem contradictory to believe that Anderson went from being "clean-shaven" one day, to having a "mustache and goatee" the next. Even without a picture, however, the trial transcript demonstrates that the evidence examined by the jury was not as conflicting as Anderson would have us believe. For instance, in closing argument the government told the jury to view the photograph of Anderson taken when he was arrested, and asked them "Is there any facial hair?" or "Is this under the neck hair?" In focusing the jury's attention on the photograph and the amount of facial hair, the government commented that Anderson had "a little facial hair in the lineup," but it also reminded the jury that the photograph was taken the following day and that some of the growth occurred during that time. Even Anderson's own trial attorney acknowledged that "the mustache is not heavy, but the growth is along the side of the face and on the chin." Thus, the jury had before it not just Anderson's asserted discrepancy concerning facial hair, but also evidence from which it could judge whether or not to accept Officer Mitchell's description of Anderson as clean-shaven.

Moreover, even if Anderson's facial hair would have been noticeable the night before, the jury also learned that

notwithstanding the discrepancies, Officer Mitchell selected Anderson from a photo array the very night of the shooting and again from a line-up the following day. Officer Mitchell also identified Anderson in court, after explaining that he had walked to within a few feet of Anderson before Anderson took flight. The jury also heard from Officer Patterson (who had not described Anderson as clean-shaven) and he unequivocally identified Anderson, both in a photo array and in court, as his shooter, stating the defendant "turned and faced me, that's when he pulled the silver object out of his--the middle of his pants and then that's when he let loose, that's when he shot me." Officer Patterson similarly testified that he was within four to five feet of the shooter before the shooter turned, shot and fled./1 As to the weight difference, that point was also argued to the jury, and as the government noted, it was Anderson himself who claimed to weigh 210 pounds at the time of his arrest. The jury could have looked at Anderson in court and in the arrest photo and determined that the estimate Officer Mitchell gave of 150 pounds was not so incredible that it overcame the two officers' unequivocal identifications of Anderson as the shooter. In sum, the jury apparently found Officers Mitchell and Patterson's identifications credible notwithstanding Anderson's attacks on the reliability of those identifications, and there is no reason to believe that the jury's assessment of those identifications would have been any different had the jury not learned that Officer McCullough was a gang specialist or that the photo array which included Anderson consisted of persons who had been arrested in the past. Nor does any unfair prejudice that may have stemmed from the admission of evidence concerning the weapons seized from Anderson's girlfriend's apartment call into question the identifications or the jury's reliance on those identifications to convict Anderson.

   The jury heard additional evidence supporting its guilty verdict. For instance, in addition to the two identifications, the jury heard testimony from Officer McCullough who stated that he had seen Anderson at the 3919 South Federal Street address on at least three

prior occasions, notwithstanding Anderson's claim that he had never been there before. From this evidence, the jury could reasonably conclude that Anderson was lying and that his claims of innocence in regard to the shooting were also false. The jury also learned that Anderson possessed .38 caliber bullets-- the same type as recovered from the crime scene--but that the gun for those bullets was missing. Additionally, the jury learned that Anderson jumped out of the second-floor window when the police appeared there the next day, and it heard evidence calling into question Anderson's explanation that he didn't know it was the police. Moreover, while Anderson took the stand and presented an alibi (claiming that he was at a friend's house in Lansing the night of the shooting), Anderson did not offer testimony from the two individuals he was allegedly visiting on the night of the shooting. From this a jury could conclude that Anderson made up the alibi, and was lying about the shooting as well. While this additional evidence is not overwhelming, when coupled with the two unequivocal identifications made by the victims who were within five feet of the shooter, we cannot say that there was a substantial likelihood that Anderson would have been acquitted had the jury not heard the challenged evidence. Therefore, we conclude that Anderson received a fair trial and was not denied due process.

B. Ineffective Assistance of Counsel

   Anderson also argues that he was denied effective assistance of counsel because his trial attorney failed to seek a limiting instruction concerning the evidence of the seized weapons, Officer McCullough's identification of himself as a gang specialist, and the testimony that Officer Mitchell picked Anderson's picture from a photo array of individuals who had been previously arrested.

   To succeed on an ineffective assistance claim, a defendant must establish that his counsel's performance was constitutionally deficient, "meaning that the performance fell below the legal profession's objective standards for reasonably effective representation" and that the deficiency prejudiced the defendant's defense, "meaning that 'there is a reasonable probability that but for

[counsel's] unprofessional errors, the results of the proceedings would have been different.'" United States ex rel. Partee v. Lane, 926 F.2d 694, 701 (7th Cir. 1991) (quoting Strickland v. Washington, 466 U.S. 668, 687-88 (1984)).

Anderson's attorney's performance was not objectively unreasonable. Rather, his attorney may have strategically decided that it was better not to ask for a limiting instruction regarding the weapons because such an instruction would highlight the evidence to the jury. Such a strategy is reasonable, especially given that the evidence about the presence of the weapons was a minor portion of the government's case. And any limiting instruction would likely have underscored the fact that .38 caliber ammunition similar to the one that hit Patterson was present. While in hindsight the strategy might not have worked, we cannot conclude that it was an objectively unreasonable view to take. Accordingly, Anderson cannot establish the first prong of Strickland.

Moreover, even if his attorney acted unreasonably in failing to seek a limiting instruction, there is not a reasonable probability that the results of the proceedings would be different. The crux of this case was the identifications by the eyewitnesses. While variances exist between Officer Mitchell's original description and Anderson's appearance, the jury heard about those differences, and in the end they apparently believed that Officer Mitchell's photo array, line-up and in-court identifications were credible, and that Officer Patterson also correctly identified his assailant. A limiting instruction on other evidence is unlikely to have changed the jury's view of this evidence. Therefore, even if Anderson's counsel were ineffective, Anderson failed to establish the requisite prejudice.

II. Conclusion

Two Chicago police officers identified Jerome Anderson as the man who shot at them in the early evening hours of March 2, 1990. While one of the officer's original description of the shooter differed from Anderson's actual appearance, the jury heard about those

discrepancies, and nonetheless concluded that Officer Mitchell and Officer Patterson's identifications of Anderson were correct. The evidence that Anderson challenges in this habeas action fails to call into question those identifications, and it is not our job to second-guess the jury's assessment of credibility. Therefore, even to the extent that the jury improperly learned that Officer McCullough was a gang specialist, that the photo array which included Anderson consisted of persons who had been arrested in the past, or that the police seized other weapons from Anderson's girlfriend's apartment, the admission of this evidence does not rise to the level of a due process violation because Anderson has failed to demonstrate a substantial likelihood that the verdict would have been different. Anderson has also failed to establish that his attorney was constitutionally ineffective, as opposed to merely a strategist who determined that it was best not to highlight to the jury the passing reference to gangs, guns and past records, and even if that constituted ineffective assistance, Anderson failed to demonstrate that any prejudice flowed from his attorney's behavior. We therefore AFFIRM.


/1 Anderson also challenges Patterson's identification, arguing that it is unreliable because Patterson did not identify Anderson at the time of the shooting, only nearly two years later, immediately before trial was to begin. The jury also knew of this fact, but apparently believed that Patterson could still vividly recall the face of the man who shot him.