In the

# United States Court of Appeals

### For the Seventh Circuit

No. 08-4143

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JESSE CHARLES ADAMS, JR.,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 4:06-CR-40081—**Joe Billy McDade,** *Judge.*

ARGUED FEBRUARY 22, 2010—DECIDED DECEMBER 13, 2010

Before KANNE and WILLIAMS, *Circuit Judges*, and
SPRINGMANN, *District Judge.**

WILLIAMS, *Circuit Judge.* A jury convicted Jesse
Charles Adams, Jr. of possession with intent to distrib-
ute and conspiracy to distribute crack cocaine from at

---

* The Honorable Theresa L. Springmann, United States
District Court for the Northern District of Indiana, sitting by
designation.

least 2001 through June 13, 2006. Adams originally raised four issues on appeal: (1) whether the district court improperly admitted testimony regarding three earlier drug-related events in violation of Rule 404(b); (2) whether the district court erred in admitting testimony related to a non-testifying "confidential source" in violation of Adams's Sixth Amendment right of confrontation; (3) whether the prosecutor's improper vouching for a witness denied Adams a fair trial; and (4) whether any errors resulted in cumulative error. We reject these arguments and affirm his conviction because: (1) the district court properly admitted the evidence of Adams's involvement in the conspiracy as direct evidence; (2) any Confrontation Clause errors were harmless; (3) the improper comment during closing remarks did not deny Adams a fair trial; and (4) Adams has not shown that but for the collective errors the jury would have come to a different verdict.

While this appeal was pending, we granted Adams's request to file a supplemental memorandum addressing the Fair Sentencing Act of 2010, its modification of 21 U.S.C. § 841, and his request for resentencing. But because the change in the statute is not retroactive, we conclude that it does not affect Adams's case, and affirm his sentence.

## I. BACKGROUND

Jesse Charles Adams, Jr. was arrested on June 13, 2006 after police officers responded to a disorderly conduct complaint in East Moline, Illinois. While Adams was in

the booking room awaiting the booking procedure, a non-arresting officer, Officer Chad Broderson, received a phone call from a confidential informant ("CI"). The CI told Officer Broderson that Adams was a known drug dealer who was currently in police custody and would likely have drugs hidden in his rectum. Officer Broderson checked to see if Adams was in custody and went to the booking cell to inspect Adams's property. A small piece of crack fell out of Adams's hat, and Officer Broderson also found a crack pipe in Adams's waistband. After Adams refused to show Officer Broderson his rectal area, the officer left the room to discuss a rectal search with an assistant state's attorney. When he returned, Adams was holding two feces-covered plastic bags which Adams claimed he found on the floor of the booking room. A videotape of Adams in the booking cell showed Adams leaning to one side and moving his hand below his waist during this time. Officer Broderson ultimately recovered a crack pipe, $861 in cash, and a total of 5.2 grams of crack cocaine and 5.9 grams of powder cocaine. Based on this arrest, Adams was indicted on August 17, 2006 for possession with intent to distribute five grams or more of crack cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B). A grand jury returned a superseding indictment on April 18, 2007 that added a second count charging Adams with conspiracy to distribute 50 or more grams of crack cocaine from at least 2001 through at least June 13, 2006, in violation of 21 U.S.C. § 846.

Adams pleaded not guilty. At trial, the government supported the conspiracy count largely through witness

testimony. Laurel Smith testified that she bought crack from Adams weekly from 2001 to 2004, except when he was unavailable, and three other women who either bought crack from, delivered crack to, or accompanied Adams on his way to buy crack testified about those events.

The government also called several police officers to testify regarding their encounters with Adams between 2001 and 2006. Sergeant Luke Blaser testified to a March 27, 2002 incident where Adams was leaning into the driver's side of a parked car occupied by Charlene Dixon. Sergeant Blaser arrested Dixon on an outstanding warrant. During this arrest, he also arrested Adams for possession of a controlled substance. At the police station, the inventory of Adams's belongings revealed he had $3,000 in cash in his pocket. This cash was grouped into two separated bundles of $1,000 in increments of $100, and the remaining $1,000 bundled in smaller bundles of $100 each.

Officer Eric Schaver testified to an arrest on May 18, 2004, when Adams was arrested for driving with an expired license. During a search, Officer Schaver found $290 in cash and a plastic bag containing 1.6 grams of crack cocaine. And on June 1, 2006, Adams was again arrested for driving without a license. Officer Darren Gault received a phone call from a CI saying that Adams had a large sum of money and was intending to buy crack cocaine. The CI also gave Adams's location and car information. During this arrest, Adams was found to have a crack pipe and $1,800 in cash, bunched in $100 bundles.

Three of Adams's alleged co-conspirators testified as to their dealings with Adams. Each acknowledged at trial that they were testifying under the terms of a plea agreement and in hopes of receiving a reduced sentence for their cooperation. William Neal was the leader of the group and the person in charge of supplying the East Moline area with drugs. Maurice Gibson testified that he received his drug supply from Neal, and became close to Adams when they were both incarcerated in 2004. Once the two were released, Gibson testified that he would distribute drugs to Adams on a consistent basis, he had an agreement with Adams to share profits from the distribution, and he saw Adams dealing crack from a shared crack house. Kenneth Wilson also received his drug supply from Neal, and testified that he had sold crack to Adams on a consignment basis. Wilson further testified that he saw Adams cooking powdered cocaine into crack for the purpose of distributing it. The three co-conspirators testified that they would front drugs to Adams with the understanding that Adams would split his profits with them. Neal testified that he initially fronted Adams with 3.5 grams of crack with the understanding that Adams would pay Neal back for that amount before he could get a larger amount to sell. Over time the amounts fronted to Adams increased, with Neal testifying that at one point, Adams was receiving a half-ounce of crack from Neal five times a week and sometimes twice a day.

Adams's attorney and the prosecution agreed to a stipulation detailing the dates of Adams's incarceration between 2000 and 2006. Adams stipulated to these dates

because his defense at trial was that he was a crack-cocaine user, not a conspirator or distributor. To further this defense and to suggest that large amounts of crack could be for self-use, Adams's counsel elicited testimony from police officers as to statements Adams made about how much crack it took him to get high. Testimony was also elicited about how much usage a crack pipe experienced and whether one crack pipe was different from another one seized from Adams. In addition to his defense that he was a crack user, counsel used the dates of incarceration to cross-examine and impeach the government's witnesses on the dates when they were supposedly conspiring or receiving drugs from Adams.

On August 13, 2008, the jury convicted Adams on Count I, possession with intent to distribute five grams or more of crack cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B). He was also found guilty of Count II, conspiracy to distribute 50 grams or more of crack cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846. He timely appealed.

## II. ANALYSIS

### A. Prior Police Encounters Properly Admitted as Direct Evidence

Adams had contact with the police on March 27, 2002; May 18, 2004; and June 1, 2006. At trial, the district court admitted testimony regarding these incidents from both civilians and police officers. On

appeal, Adams argues that the district court erred in admitting this testimony, because the evidence was impermissibly used for propensity purposes in violation of Federal Rule of Evidence 404(b).

As an initial matter, the parties dispute the relevant standard of review applicable to the evidentiary rulings. If a party makes a timely, specific objection to the evidence in question, we consider that objection to be preserved on appeal and review the district court's ruling for abuse of discretion. *United States v. Whitaker*, 127 F.3d 595, 601 (7th Cir. 1997) (in order to preserve the evidentiary argument on appeal, the party must "stat[e] the specific ground of objection, if the specific ground is not apparent from the context"). If no such objection is made, we review the decision for plain error. *United States v. Garcia*, 580 F.3d 528, 536 (7th Cir. 2009). Here, the government argues that Adams's defense counsel's objections at trial were not specific enough to preserve the Rule 404(b) ground and warrant the more demanding abuse of discretion standard. We doubt that Adams's general or relevancy objections to the testimony about prior drug-related events were specific enough to preserve Rule 404(b) grounds, *United States v. Gibson,* 170 F.3d 673, 677-78 (7th Cir. 1999), but even if we assume Adams preserved the argument, it fails.

Adams contends that the district court erred in admitting evidence of his prior arrests, because the evidence served no real purpose other than to demonstrate his propensity to commit the crimes, a purpose prohibited by Rule 404(b). Adams also argues that even if the evidence

was admissible, it was unfairly prejudicial and should have been excluded. Federal Rule of Evidence 404(b) excludes evidence used "to prove the character of a person in order to show action in conformity there-with." Fed. R. Evid. 404(b). Notably, Rule 404(b) only applies to "[e]vidence of *other* crimes, wrongs, or acts . . . ." *Id*. (emphasis added). So, if the evidence is admitted as direct evidence of the charged offense, Rule 404(b) is not applicable. *See United States v. Alviar*, 573 F.3d 526, 538 (7th Cir. 2009). Specifically, evidence directly pertaining to the defendant's role in a charged conspiracy is not excluded by Rule 404(b). *Id*. Of course, Rule 403 may continue to protect the defendant against admission of the evidence if it would be "unduly prejudicial." Fed. R. Evid. 403.

Rule 404(b) has no role to play here, because all the challenged evidence is direct evidence of Adams's role in the charged conspiracy and not propensity evidence. The circumstances of the March 27, 2002 arrest directly relate to the indictment's conspiracy count charging that Adams had been involved in a conspiracy with other people from at least 2001 to June 13, 2006. The testimony showed that Adams occupied a car containing cocaine and had a large amount of cash folded into $100 sections. The evidence directly supported the conspiracy charge by showing his involvement in conditions highly probative of conspiratorial drug distribution, namely large amounts of cocaine and cash arranged in specific monetary increments. *See, e.g.*, *United States v. Penny*, 60 F.3d 1257, 1263 (7th Cir. 1995) (finding evidence

of "unexplained wealth" probative of drug conspiracy); *United States v. Zarnes*, 33 F.3d 1454, 1465 (7th Cir. 1994) (finding evidence of large drug quantities to indicate a conspiracy).

Adams maintains that this 2002 arrest should be irrelevant, because he did not meet some of his co-conspirators until 2004. There is no requirement, however, that a conspiracy involve exactly the same parties for the entire length of its existence. *See United States v. Kincannon*, 567 F.3d 893, 898-99 (7th Cir. 2009); *United States v. Townsend*, 924 F.2d 1385, 1389-90 (7th Cir. 1991) ("[T]he government doesn't have to prove with whom a defendant conspired; it need only prove that the defendant joined the agreement alleged, not the group."). Evidence from 2002 is certainly relevant to the charged conspiracy (which began in "at least 2001" and involved "other people" according to the indictment), regardless of which specific co-conspirators were involved during the early years. The government elicited testimony that Adams began dealing crack in 2001, which supported its charge that he was engaged in conspiracy to distribute drugs at that time. Even though Adams was not yet involved with all of his eventual co-conspirators at the time of his arrest in 2002, the circumstances of that arrest are directly relevant to the charged conspiracy to distribute drugs beginning in at least 2001.

Next, Adams challenges testimony from Laurel Smith and Officer Eric Schaver regarding his May 18, 2004 arrest. Like the 2002 arrest, this testimony also provides direct evidence of the charged conspiracy. Smith testified

that she was a regular customer of Adams. On one oc-
casion, she had loaned her car to Adams in exchange
for crack cocaine. Smith stated that when Adams did not
return the car as expected, she called a tip into the po-
lice. Other witnesses testified that they had fronted drugs
to Adams around May 2004. Therefore, Smith's testimony
that Adams provided her with crack cocaine sup-
ports the government's argument that Adams was
re-distributing cocaine and is directly relevant to the
charged conspiracy. The arresting officer testified he
found cash and crack cocaine in Adams's pockets.
This testimony is circumstantial evidence of the drug
conspiracy itself, not a different crime, wrong, or act
excluded by Rule 404(b).

Finally, the government presented testimony relating
to Adams's June 1, 2006 arrest. The arresting officer
testified that he found a crack pipe and a large amount
of cash folded in bundles on Adams's person. He also
testified that Adams discussed his crack addiction
and plans to purchase more crack cocaine. This is also
direct evidence of the conspiracy, because crack cocaine
paraphernalia and cash folded into specific increments
are circumstantial evidence of a drug distribution con-
spiracy. *See e.g., Penny*, 60 F.3d at 1263; *Zarnes*, 33 F.3d
at 1465.

We think it is a much closer question whether the
evidence of these prior arrests and drug-related events
should have been excluded under Rule 403. Even when
the testimony is direct evidence of the charged con-
spiracy and Rule 404(b) is not involved, Rule 403

would still protect Adams against evidence that is unduly prejudicial. *See United States v. Sophie*, 900 F.2d 1064, 1074 (7th Cir. 1990). We remain wary of the potential for unfair prejudice in the admission of prior criminal acts, *Old Chief v. United States*, 519 U.S. 172, 185 (1997); *United States v. Avila*, 557 F.3d 809, 818 (7th Cir. 2009), and we agree with the defendant that many of the details of the police encounters were unnecessary to get into evidence facts regarding Adams's possession of large amounts of crack and cash. For example, during Officer Schaver's testimony regarding the May 18, 2004 arrest, he referred to his familiarity with Adams's mug shot and home address from past police responses. Further, we question whether any details of the arrests were needed to get in the evidence about drug amounts and cash bundles. The court should have directed witnesses to avoid discussing details of any arrests and to testify only to the drug amounts and cash bundles found on Adams on the relevant dates. However, the prosecution did focus its examination on the drug amounts and cash bundles found on Adams, and not on any results of the police encounters. In light of the balancing test required under Rule 403, and cognizant of the wide discretion a district court has to make evidentiary rulings, the district court did not err by determining the probative value of the evidence to be greater than its prejudicial effect. The jurors were likely already aware that Adams had a mug shot and they were most certainly aware of his extensive prior contact with police from his trial stipulations of the various periods of time spent incarcerated. In the stipula-

tion given to the jury and again during the closing remarks, Adams admitted to each time he was incarcerated during the period of the alleged conspiracy. This was an extensive list: for example, he was incarcerated for various arrests during the majority of the year 2004.

The evidence in question was directly related to the charged conspiracy, should not have been excluded under Rule 404(b) as prior bad act evidence, and was not unduly prejudicial under Rule 403. Therefore, the district court did not abuse its discretion in admitting evidence regarding Adams's possession of cocaine, large amounts of cash, and distribution habits during the time of the charged conspiracy.

### B. Any Confrontation Clause Errors Were Harmless

Next, Adams argues that the district court erred by allowing two police officers to testify regarding two conversations they had with a non-testifying confidential source about Adams. He challenges the admission of a CI's statements that led to a search while he was in a booking cell on June 13, 2006 and the admission of a CI's statements that led to a traffic stop on June 1, 2006. The Confrontation Clause of the Sixth Amendment bars the admission of testimonial hearsay evidence unless the declarant is unavailable and the defense had a prior opportunity to cross-examine him. *Crawford v. Washington*, 541 U.S. 36, 53-55 (2004); *United States v. Watson*, 525 F.3d 583, 588-89 (7th Cir. 2008). A statement is considered testimonial if it is given under circum-

stances which would lead an objective witness to believe that the statement would be used at a later trial. *Watson*, 525 F.3d at 589. Our cases recognize there is a particular potential for abuse when police officers testify to out-of-court statements by confidential informants. *United States v. Silva*, 380 F.3d 1018, 1020 (7th Cir. 2004). We review de novo whether an evidentiary ruling violates the Confrontation Clause, and a harmless error analysis applies. *United States v. Castelan*, 219 F.3d 690, 694 (7th Cir. 2000).

### 1. June 13, 2006 CI Statement

On June 13, 2006, Adams was arrested and held in a booking room. At trial, Officer Broderson testified that a CI called the police station to tell him that Adams had been arrested after leaving a drug dealer's residence, was currently being held at the police station, and had drugs on his person, specifically in his rectal area. Until this CI call, Officer Broderson was not involved in Adams's arrest and had no reason to know that Adams was in the building. Officer Broderson followed up on this information, and as a result, he recovered crack from the booking cell.

The government argues that the CI's statements to Officer Broderson were not introduced for the truth but merely as a foundation for explaining why the officer went down to the booking area and his subsequent actions. The government also assures this court that the admitted testimony was "brief" in explaining why the foundational testimony was admissible. We disagree.

The CI's statements directly inculpate Adams on the charge of possessing crack with the intent to distribute it, and were not necessary to provide any foundation for the officer's subsequent actions. The brevity of an inadmissible statement may show its harmlessness, but it cannot make an inadmissible statement admissible. The CI's statements here are different from statements we have found admissible that gave context to an otherwise meaningless conversation or investigation. *See, e.g.,* *United States v. Tolliver*, 454 F.3d 660, 666 (7th Cir. 2006) (defendant's statements on the tape recording would only make sense with the CI's side of the conversation); *Silva,* 380 F.3d at 1020 (noting generally that a CI statement may be introduced if it would help the jury understand why the police targeted a seemingly random individual); *cf. United States v. Lovelace*, 123 F.3d 650, 653 (7th Cir. 1997) (error to introduce a tip to explain why police officers pulled over defendant in the absence of any need for context). Here, the CI's accusations did not counter a defense strategy that police officers randomly targeted Adams. And, there was no need to introduce the statements for context—even if the CI's statements were excluded, the jury would have fully understood that the officer searched Adams and the relevance of the items recovered in that search to the charged crime. The CI's statement was offered for its truth—that Adams possessed crack on his person—and it was testimonial. The district court erred by allowing its admission through Officer Broderson's testimony.

   Although the statement violated Adams's Sixth Amendment right to confront his witnesses, the error was harm-

less. Whether an error is harmless beyond a reasonable doubt depends upon factors such as (1) the importance of a witness's testimony in the prosecution's case; (2) whether the testimony was cumulative; (3) the presence or absence of corroborating or contradictory evidence; and (4) the overall strength of the prosecution's case. *Castelan*, 219 F.3d at 696. Here, the evidence was overwhelming that Adams possessed crack on June 13, 2006. Officer Broderson found the crack in Adams's hat and smoking paraphernalia in his waistband. Then, Adams refused a rectal search. Officer Broderson left Adams in an empty booking cell to talk to a state's attorney. When he returned minutes later, Officer Broderson found Adams with two-feces covered baggies in his hand. A video of the room during this time shows Adams leaning over on the bench and putting his hand down his waistband before the feces-covered baggies of crack appeared in the booking cell. Given this evidence, the error of introducing the CI's statement was harmless.

### 2. June 1, 2006 CI Statement

The second CI statement that Adams challenges served as the basis for a police encounter on June 1, 2006. Officer Gault initiated a police stop of Adams's car and found Adams with a large amount of cash and a crack pipe. When asked by the prosecution to explain how and why he initiated this police stop, Officer Gault explained that he had been contacted by a CI. According to Officer Gault, this CI explained that Adams was involved in drugs, had a large amount of money on him and was on

his way to buy crack, and described the car Adams was driving. Over the defense's objection, the district court allowed this testimony as "foundation" for what the police officer did. The district court did issue a limiting instruction to the jury, stating the court was "allowing this testimony not to prove the truth of what he was told but simply as a foundation for what he did." Later, Officer Gault also confirmed that the car Adams was driving matched the description given by the CI.

The government does not deny the statements are testimonial, but argues they are relevant non-hearsay because they give context to the investigation and explain why the police officer did what he did. As we said in *Silva*: "under [this] theory, every time a person says to the police 'X committed the crime,' the statement . . . would be admissible to show why the police investigated X. That would eviscerate the constitutional right to confront and cross-examine one's accusers." *Silva*, 380 F.3d at 1020. Once the court was alerted to the problem, it should have ensured that any references to the CI's statements were eliminated in the police officer's testimony about the June 1, 2006 encounter. Here, the impermissible CI statements are even more dangerous than the CI statements admitted in relation to the June 13, 2006 incident because they not only provide the reason for a specific police encounter, but also implicate Adams in the larger conspiracy. The officer testified that the police department had "cultivated" the CI to give them information about "drug dealers, distributors, or people that possess narcotics" and that the CI said that Adams was "one of the local people that were involved in drugs." There was no purpose to this testimony except for the

jury to believe its truth, that Adams was a person involved in drugs.

The statement should not have been admitted, but again the error was harmless. The CI's statements were fully corroborated and independently confirmed by Officer Gault's first-hand knowledge of the incident and the evidence found on Adams that day. Furthermore, the evidence that Adams was not a mere drug user but a member of a larger conspiracy to distribute drugs was independent of any of these statements. Four women testified that they had acquired drugs from, delivered drugs to, or accompanied Adams to buy drugs. Most importantly, three co-conspirators testified against Adams. The CI's statements were cumulative of this other evidence presented at trial, and we find that the error was harmless. *Castelan*, 219 F.3d at 697-98.

### C. Prosecutor's Improper Remarks Did Not Deprive Adams of a Fair Trial

In her closing remarks, the prosecutor improperly expressed her personal belief in the truthfulness of a witness, which the government concedes was improper. *United States v. Anderson*, 303 F.3d 847, 855 (7th Cir. 2002). Specifically, the prosecutor stated, "Others like Laurel Smith were judge subpoenaed to be here to come into court and tell the truth. She took an oath, 'I will tell the truth.' And ladies and gentlemen, I believe that's what she did." The government acknowledges it was improper for the prosecutor to express her belief that Laurel Smith, a frequent customer of Adams during the early years of the conspiracy, had told the truth

when she testified about various occasions when she
purchased drugs from Adams.

If comments are improper, we will examine the record
to determine if they deprived the defendant of a fair
trial. *United States v. Scott*, 267 F.3d 729, 740 (7th Cir.
2001). In doing so, we consider five factors: (1) the
nature and seriousness of the misconduct; (2) the extent
to which the comments were invited by the defense;
(3) the extent to which any prejudice was ameliorated
by the court's instruction to the jury; (4) the defense's
opportunity to counter any prejudice; and (5) the weight
of the evidence supporting the conviction. *Id.* Here, Ad-
ams's counsel failed to object to the remark at trial, and
so Adams has the additional burden of overcoming
plain error review. We require the defendant to show
that not only did the plainly improper remarks deprive
him of a fair trial, "but also that the outcome of the pro-
ceedings would have been different absent the re-
marks." *Id.* (citations omitted).

Smith was one of the few government witnesses who
was neither cooperating under a plea agreement, nor a
police officer. This may have made her testimony par-
ticularly important to the jury. *Cf. United States v.
LeFevour*, 798 F.2d 977, 983-84 (7th Cir. 1986) (discussing
the practice of the government eliciting information
about a cooperating witness's plea agreement in direct
examination so as to take the "sting" and "shock[ ]" out of
discovering the reason for testimony on cross-examina-
tion). The improper remark was serious, and the district
court did not issue instructions to the jury to disregard
the remarks (and the defense did not ask the court to

issue any such instructions). Defense counsel had the opportunity to refute the prosecutor's comment in its closing statement, and did so by reminding the jury that they had to "make a determination whether or not [Smith] is believable," and that the jurors were the only ones who could judge credibility. The prosecution did not reference any improper remarks in its rebuttal. And, most importantly, the weight of the evidence against the defendant was substantial and eliminated any doubt that the "prosecutor's remarks unfairly prejudiced the jury's deliberations or exploited the Government's prestige in the eyes of the jury." *Alviar*, 573 F.3d at 543 (citations omitted). Three of Adams's co-conspirators testified to the conspiracy and Adams's role in it. Even without Smith's testimony, other women testified to Adams's role as a drug dealer. Because this is a review under plain error, Adams must show that he would have been acquitted had it not been for the prosecutor's comment. *Scott*, 267 F.3d at 740. We conclude that the government's improper remark did not change the outcome of the trial, and so the district court did not err in denying Adams a new trial.

### D.  No Cumulative Error

Finally, Adams argues that even if each error was individually harmless, the errors taken together prejudiced his right to a fair trial. To demonstrate cumulative error, Adams must show that (1) at least two errors were committed during the trial, and (2) these errors denied Adams a fundamentally fair trial. *United States v. Connor*, 583 F.3d 1011, 1027 (7th Cir. 2009); *Alvarez v. Boyd*, 225

F.3d 820, 825 (7th Cir. 2000). But, "the Constitution entitles the criminal defendant to a fair trial, not a perfect one." *United States v. Neeley*, 189 F.3d 670, 679 (7th Cir. 2000) (quoting *Rose v. Clark*, 478 U.S. 570, 579 (1986)). So we examine the entire record, looking at factors such as the nature and number of errors committed, the inter-relationship and combined effect of the errors, how the trial court handled the errors, and the strength of the prosecution's case. *Boyd*, 225 F.3d at 825. We will only provide relief if we determine that the effect of the errors, considered together, could not have been harm-less. *Id.*

As to the first prong, we have determined there were at least three errors. In violation of Adams's right to confront his witnesses, the district court admitted the statements of the non-testifying CI to Officer Broderson and the statements of the non-testifying CI to Officer Gault. There was also a third error, in that the pros-ecutor improperly vouched for Smith's truthfulness. However, we are not convinced that "but for the errors, the outcome of the trial probably would have been dif-ferent." *Id*. As to the possession with intent to distribute charge, the evidence is overwhelming. The crack co-caine was found in his possession while left alone in a booking cell at a police station. The amount of the drugs found, and their hidden location inside his rectal area, were enough for a jury to infer he had the intent to distribute them. As to the conspiracy charge, the strongest witnesses against Adams were his co-con-spirators. And those witnesses, if believed, would have been more than sufficient to convict Adams. These co-

conspirators testified consistently and corroborated Adams's involvement and participation in their conspiracy to distribute crack cocaine. The multiple errors that occurred were unfortunate, but the record here fairly demonstrates Adams's guilt, "such that none of the asserted errors, either individually or cumulatively" could have affected the jury's result. *Anderson v. Sternes*, 243 F.3d 1049, 1055 (7th Cir. 2001).

## E. The Fair Sentencing Act of 2010 Does Not Apply

While his appeal was pending, we granted Adams's request to submit a supplemental memorandum and to seek resentencing under the Fair Sentencing Act of 2010 ("FSA"). We now reject his argument that the FSA applies to his case.

The district court conducted Adams's sentencing hearing on December 5, 2008. Following the hearing it sentenced Adams to life imprisonment for Count II, conspiracy to distribute 50 grams or more of crack cocaine. This was the mandatory statutory minimum sentence in place at the time under 21 U.S.C. § 841(b)(1)(A)(iii) based on the court's finding that Adams conspired to distribute 61.2 grams of crack cocaine and had two prior felony convictions involving crack cocaine.[1]

---

[1] The court also sentenced Adams to 151 months' imprisonment for Count I, possession with intent to distribute, to run concurrent with the conspiracy sentence.

On August 3, 2010, the penalty provisions of 21 U.S.C. § 841(b)(1)(A)(iii) were modified by the FSA. Under the new law, a person with two or more prior felony convictions must be found responsible for 280 grams or more of crack cocaine to trigger a mandatory life sentence.

Adams argues that because he was only found responsible for 61.2 grams of crack cocaine, under the new law he would no longer be subject to a statutory minimum life sentence, and he should be resentenced. However, we have recently held that the FSA is not retroactive. *United States v. Bell*, 624 F.3d 803, 814 (7th Cir. 2010). Because Adams was sentenced before the FSA became law, it does not require him to be resentenced, and so we affirm his sentence.

## III. CONCLUSION

For the reasons expressed above, we AFFIRM Adams's conviction and sentence.

12-13-10