In the

# United States Court of Appeals
## For the Seventh Circuit

No. 04-3946

WARREN GOODMAN,

*Petitioner-Appellant,*

*v.*

DANIEL BERTRAND, Warden,

*Respondent-Appellee.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 00-C-0650—**Patricia J. Gorence**, *Magistrate Judge.*

ARGUED DECEMBER 9, 2005—DECIDED OCTOBER 31, 2006

Before FLAUM, *Chief Judge*, and RIPPLE and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* Fourteen years ago, an individual entered a Milwaukee convenience store, robbed the store's manager and cashier at gunpoint, and then fled in a getaway car. After a first trial ended in a hung jury, a second jury convicted Warren Goodman of armed robbery and being a felon in possession of a firearm, and he was sentenced to twenty-two years' imprisonment. Having exhausted his state court remedies, Goodman petitioned for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging the effectiveness of his counsel during the second trial. The United States District Court for the

Eastern District of Wisconsin denied relief. Unlike the district court, we find, under the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 ("AEDPA"), that the state court decision was contrary to the ineffective assistance of counsel standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). Further, we conclude, under AEDPA, that the state court decision was an unreasonable application of *Strickland* because the cumulative effect of counsel's errors constituted ineffective assistance of counsel. Therefore, we reverse the judgment of the district court and remand for the entry of an order granting the writ.

## I. BACKGROUND

On July 28, 1992, an individual robbed Kohl's Food Store, a convenience store in Milwaukee, holding the store's cashier, Ilene Retzlaff, and manager, Daniel Kollath, at gunpoint. After the two complied with the gunman's demands, the assailant fled in a getaway car, driven by an accomplice. Blocks later, the men switched to a second getaway car that was driven by a third accomplice. Later that day, police stopped Mark Smith and Larry Ross, who were riding in a car matching the description of the second getaway car. Police retrieved two handguns and $200 from the car.[1] Smith eventually confessed that he acted as a lookout in the robbery, and fingered Ross as an accomplice. Smith also brokered a deal with prosecutors in which, in exchange for more lenient punishment, he implicated Goodman. In a lineup, the store manager Kollath initially identified another person as the robber, but in a subsequent lineup he chose Goodman. The store cashier, Retzlaff, did not pick Goodman from the lineup, instead choosing

---

[1] There is no indication in the record that the police attempted to retrieve fingerprints from the seized guns.

another individual as the person who most resembled the robber.

## A. *Goodman's first and second trials*

The case against Goodman went to trial twice. In each instance, the facts of the robbery were essentially undisputed; only the identification of Goodman as the perpetrator was at issue. In the first trial, confessed-lookout Smith and store manager Kollath both testified that Goodman robbed the store. The store cashier testified that she could not identify Goodman as the robber and that she chose another person from the police lineup. Goodman also testified on his own behalf. The court declared a mistrial after the jury was unable to reach a verdict.

Smith received six years' imprisonment for his role in the robbery, in exchange for his testimony in the first trial. Ross, who was serving a seventeen-year sentence for being the driver of the second getaway car, contacted the prosecution after the first trial and agreed to testify against Goodman at the retrial and to identify the driver of the first getaway car, in exchange for a recommendation to reduce his sentence. Ross later named Percy Sallis, who confessed that he was the first getaway car driver.

At the second trial, Goodman was represented by a different lawyer. Kollath, as well as confessed accomplices Smith, Ross, and Sallis, all testified that Goodman committed the robbery. Unlike the first trial, the store's cashier, Retzlaff, did not testify because she was on vacation and Goodman's lawyer failed to subpoena her. Goodman's counsel erroneously believed that a subpoena was unnecessary because the government would call Retzlaff as a witness. Because Goodman's counsel failed to demonstrate that Retzlaff was unavailable to testify in person, the trial court excluded portions of her prior testimony from the second trial. So in the second trial, four witnesses, including

the three accomplices, identified Goodman as the robber, and Retzlaff was not present to testify.

Other problems arose for Goodman's counsel during the course of the second trial. On direct examination, Goodman's counsel asked Goodman a question that ultimately led the court to allow cross-examination on two of Goodman's previous armed robbery convictions.[2] As the parties had earlier stipulated to Goodman's status as a convicted felon, in the normal course of proceedings the prosecution would have been precluded from raising the nature of the prior felonies.

In addition, prosecution witnesses Mark Smith and Larry Ross testified regarding threats they received concerning their participation in the Goodman trial. While the witnesses acknowledged that the threats were not made by Goodman, nor was he was present when they were made, the witnesses claimed that the threats were intended to prevent them from testifying against Goodman. Goodman's

---

[2] During direct examination, Goodman's counsel, while showing Goodman exhibits of guns connected to the crime, abruptly asked, "[D]id you do any armed robberies?" to which the defendant answered, "No." The prosecution asked to approach the bench, and there was an unrecorded sidebar. Goodman's counsel then rephrased the question, asking "Did you do the armed robbery at the Marks Big Boy that they accused you of?" to which the defendant again replied, "No." At the conclusion of Goodman's direct examination, the trial judge briefly dismissed the jury, and ruled that counsel's use of the vague term "any" could leave the jury with the mistaken impression that the defendant had never committed any armed robberies, when in fact he had previously been convicted of two robberies. Goodman's counsel argued that he was clearly referring to the Kohl's Food Store robbery and another robbery at the Marks Big Boy store for which Goodman was charged but later cleared. However, the court disagreed and the prosecution was permitted to cross-examine Goodman on the issue of which armed robberies he had committed.

counsel objected, asserting that the witnesses' testimony impermissibly linked Goodman to the threats in the minds of the jurors. The trial court admitted the testimony on limited grounds, stating, outside the presence of the jury, that such testimony would reflect the witnesses' credibility by demonstrating that they had something to lose as well as something to gain by testifying. Goodman's counsel later failed to request a jury instruction explaining to the jury the limited manner in which they could use the testimony.

In addition, Goodman's counsel did not object after the prosecution made misleading statements on direct examination indicating that the state had not given Ross any reason to testify, when in fact Ross had agreed to do so in the hopes of receiving a reduced sentence. During closing argument the prosecutor also made false statements improperly bolstering Sallis's testimony by stating that Sallis could not have been charged or convicted without his voluntary confession while omitting the fact that Ross had named Sallis as an accomplice before Sallis confessed. Goodman's counsel did not object or request a mistrial.

The jury ultimately found Goodman guilty, and he was sentenced to twenty-two years for the robbery and for being a felon in possession of a firearm during its commission. For his testimony and at the government's recommendation, Ross's initial seventeen-year sentence was later reduced to twelve years. Sallis received probation, conditioned on six months of work release, for his part in the robbery.

## B. Post-conviction proceedings

After his conviction, Goodman sought relief in state court. Goodman argued that, in violation of the Sixth Amendment, his second trial counsel was ineffective for (1) opening the door to cross-examination on Goodman's two prior convic-

tions for armed robbery, (2) failing to procure copies of government witnesses' prior inconsistent testimony, (3) failing to subpoena the store's cashier to testify, and (4) being generally unfamiliar with the case. The trial court denied the motion. The Wisconsin Court of Appeals affirmed stating as follows:

> [W]e, like the trial court, conclude that the record conclusively establishes that Goodman was not prejudiced within the meaning of *Strickland*. . . . In order to show prejudice, the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. The *Strickland* test is not an outcome-determinative test. In decisions following *Strickland*, the Supreme Court has reaffirmed that the touchstone of the prejudice component is whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair.

The court concluded that, even if his counsel's performance was deficient, Goodman's Sixth Amendment claim failed because "none of Goodman's counsel's alleged deficient conduct prejudiced him such that the result of the trial was unreliable."[3]

Goodman then presented his Sixth Amendment claim in a state habeas petition pursuant to Wis. Stat. § 974.06 and argued that his trial counsel was ineffective for (1) failing to request a limiting instruction regarding the testimony of threats, (2) failing to object regarding the denial of his right to confront witnesses against him, and (3) failing to object

---

[3]  *State v. Goodman*, No. 96-0017-cr, unpublished slip op. (Wis. Ct. App. Mar. 11, 1997).

to prosecutorial misconduct during closing arguments. The trial court denied relief, and the appellate court affirmed. The Wisconsin Supreme Court denied habeas review.

Following these adverse rulings in state court, Goodman timely filed his federal habeas petition pursuant to 28 U.S.C. § 2254 in the United States District Court for the Eastern District of Wisconsin. Goodman maintained that, during direct appeal, the state court erred when it required him to prove the alleged errors of his counsel rendered his second trial unreliable or fundamentally unfair. The district court denied habeas relief, holding that the state court decision was not an unreasonable application of, or contrary to, clearly established federal law. *See* 28 U.S.C. § 2254. Goodman timely appealed.

## II. ANALYSIS

This appeal presents two questions: Did the state court apply the wrong legal standard to Goodman's ineffective assistance of counsel claim? And, under the correct legal framework, did the court unreasonably reject Goodman's Sixth Amendment claim? Reviewing the district court's denial of habeas relief de novo, *Van Patten v. Deppisch*, 434 F.3d 1038, 1042 (7th Cir. 2006), we affirmatively answer both questions.

Under the relevant provision of AEDPA, Goodman is entitled to habeas relief if "the relevant state-court decision was either (1) 'contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States,' or (2) 'involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States.'" *Williams v. Taylor*, 529 U.S. 362, 404-05 (2000) (quoting 28 U.S.C. § 2254(d)(1)); *see also Sweeney v. Carter*, 361 F.3d 327, 330 (7th Cir. 2004). A state court decision is contrary to clearly established federal law "when the state court applies

a rule that contradicts the governing law set forth by the Supreme Court or, on facts materially indistinguishable from the facts of an applicable Supreme Court precedent, reaches a different result." *Badelle v. Correll*, 452 F.3d 648, 654 (7th Cir. 2006) (internal citations omitted). We do not use hindsight to assess whether a law is clearly established; instead our inquiry looks to the law of the Supreme Court at the time of the last state court decision on the merits, which, in this case, is the Wisconsin Court of Appeals decision disposing of Goodman's direct appeal. *See Charlton v. Davis*, 439 F.3d 369, 374 (7th Cir. 2006) ("The relevant decision for purposes of our assessment is the decision of the last state court to rule on the merits of the petitioner's claim . . .").

In *Strickland*, the Supreme Court announced the framework for assessing Sixth Amendment ineffective assistance of counsel claims, and the *Strickland* framework was clearly established by the time of Goodman's direct appeal. *See Williams*, 529 U.S. at 391 ("It is past question that the rule set forth in *Strickland* qualifies as 'clearly established Federal law, as determined by the Supreme Court of the United States.'"). A petitioner asserting an ineffective assistance of counsel claim under *Strickland* must show that his counsel's performance was deficient and that the deficient performance prejudiced the defense. Counsel's performance is deficient when the "representation f[alls] below an objective standard of reasonableness" under "prevailing professional norms." *Strickland*, 466 U.S. at 688. To establish prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Goodman argues that the state court's decision, requiring him to demonstrate that his second trial was fundamentally unfair, was contrary to the prejudice analysis set forth in *Strickland,* which requires him only to show there is a reasonable probability of a

different result. The district court found that the state court decision comported with *Strickland* and, therefore, that Goodman was not entitled to relief. We disagree.

Previously, there was some confusion among courts attempting to reconcile *Strickland*'s prejudice analysis, which looks at the reasonable probability of a different result, with the Supreme Court's subsequent statement in *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993), that "an analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective." In *Washington v. Smith*, a case strikingly similar to the one now before us, we addressed this seeming contradiction in the Court's precedent:

> There is some superficial tension between *Strickland*'s statement of the prejudice standard, which looks to outcome determination, and *Lockhart*'s, which looks beyond outcome determination to the fundamental fairness of the proceeding, but this tension evaporates when one understands that the heightened prejudice standard in *Lockhart* "concerns the unusual circumstance where the defendant attempts to demonstrate prejudice based on considerations that, as a matter of law, ought not inform the inquiry." *Lockhart*, 506 U.S. at 373 (O'Connor, J., concurring). The Supreme Court recently removed all doubt—again in its recent *Williams* decision—that *Strickland* governs the prejudice inquiry in most habeas cases and that the decision in *Lockhart* does "not justify a departure from a straight-forward application of *Strickland* when the ineffectiveness of counsel does deprive the defendant of a substantive or procedural right to which the law entitles him." *Williams*, 120 S. Ct. at 1513 (emphasis in original). The Wisconsin Court of Appeals apparently did not fully grasp the proper

interaction between *Strickland* and *Lockhart* in determining that Washington did not show prejudice, and in so doing, its decision was both "contrary to" and "involved an unreasonable application of" the proper prejudice analysis prescribed by the Supreme Court.

*Washington v. Smith*, 219 F.3d 620, 632-33 (7th Cir. 2000). In short, "*Lockhart* did not modify or supplant *Strickland*'s prejudice test in a case such as this one . . . ." *Id.* at 633. *Lockhart*'s heightened prejudice analysis only applies in cases where the defendant challenges his conviction based upon unusual circumstances that, as a matter of law, do not typically inform the court's inquiry. For example, such unusual circumstances could occur when a state court relies on overruled law, *see Lockhart*, 506 U.S. at 384, or the defendant's lawyer refuses to let him commit perjury, *see Nix v. Whiteside*, 475 U.S. 157, 171 (1986). Absent such unusual circumstances, *Strickland*'s prejudice analysis is the proper framework for assessing a Sixth Amendment claim.

"One of the most obvious ways a state court may render a decision 'contrary to' the Supreme Court's precedents is when it sets forth the wrong legal framework." *Van Patten*, 434 F.3d at 1042 n.2 (citing *Williams*, 529 U.S. at 397-98). In *Washington*, the petitioner argued that his counsel was ineffective for, among other reasons, failing to subpoena a crucial defense witness. The Wisconsin Court of Appeals applied *Lockhart*'s heightened prejudice standard and ruled that the petitioner's Sixth Amendment claim failed because he failed to show that the alleged deficiencies rendered "the result of the trial unreliable or the proceeding fundamentally unfair." *State v. Washington*, No. 93-1129-CR, 1994 WL 51649, at *2 (Wis. Ct. App. Feb. 22, 1994) (quoting *Lockhart*, 506 U.S. at 369). We concluded that the state court decision applied the wrong legal principle and affirmed habeas relief. *Washington*, 219 F.3d at 632-33, 635.

To be sure, in *Washington*, the state appellate court mentioned *Strickland* only in passing and exclusively applied *Lockhart* in its prejudice analysis. *Id.* at 633 n.9. This case is somewhat more complicated because the state court cited *Strickland* in its opinion, set forth the two-prong *Strickland* test, and even concluded that "Goodman was not prejudiced within the meaning of *Strickland*." In denying relief, the district court reasoned that these references suggest the appellate court correctly applied the *Strickland* standard. We disagree. There is a difference between what the state court said and what it actually did. Although, in a boilerplate fashion, the court cited the *Strickland* rule, it repeatedly reasoned that Goodman failed to show that his second trial was "fundamentally unfair" or "unreliable." In conflating *Lockhart*'s heightened prejudice standard with *Strickland*'s prejudice analysis, the state court decision is "contrary to" clearly established federal law. 28 U.S.C. § 2254(d)(1).

Even if the Wisconsin Court of Appeals decision were not contrary to federal law, it was an unreasonable application of *Strickland*. The"unreasonable application" prong of AEDPA means the state court's decision lies "well outside the boundaries of permissible differences of opinion." *Hardaway v. Young*, 302 F.3d 757, 762 (7th Cir. 2002); *see also Jackson v. Frank*, 348 F.3d 658, 662 (7th Cir. 2003) ("We have held that under this criterion, habeas relief should not be granted if the state court decision can be said to be one of several equally-plausible outcomes."). In the habeas context, an "unreasonable" application is more than simply an "incorrect" application, so "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411. Instead, "the state-court decision must be both incorrect and unreasonable." *Woods v. McBride*, 430 F.3d 813, 817 (7th Cir. 2005).

As we have stated, *Strickland* instructs that Goodman must show that his lawyer's performance was deficient and that he was prejudiced as a result. 466 U.S. at 688. Although counsel is strongly presumed to have rendered adequate assistance based upon his or her reasonable professional judgment, *United States v. Traeger*, 289 F.3d 461, 470 (7th Cir. 2002), "it is not the role of a reviewing court to engage in a post hoc rationalization for an attorney's actions by constructing strategic defenses that counsel does not offer . . . ." *Brown v. Sternes*, 304 F.3d 677, 691 (7th Cir. 2002) (internal quotation marks and citation omitted).

Goodman argues that his trial counsel's performance fell below an objective standard of reasonableness because his lawyer: (1) opened the door for admission of Goodman's two prior convictions for armed robbery, (2) failed to subpoena the store's cashier to testify, (3) failed to request a limiting instruction regarding the threats evidence, (4) failed to properly object and preserve the record regarding the denial of Goodman's right to confront the witnesses against him, and (5) failed to object and request a mistrial based upon prosecutorial misconduct in closing argument. Like the petitioner in *Washington,* Goodman maintains that his counsel was ineffective for failing to subpoena a critical defense witness, who testified in the first trial that she was unable to identify Goodman from a lineup after the robbery. Goodman's lawyer failed to subpoena Retzlaff because he (erroneously) believed the government would call her as a witness; much to his lawyer's dismay and Goodman's peril, this did not occur. Further, counsel's attempts to introduce at retrial portions of Retzlaff's testimony during the first trial were unsuccessful because, under Federal Rule of Evidence 804(b)(1), he failed to demonstrate that she was unavailable to testify in

person.[4] There is little tactical wisdom in counsel resting on his hands and assuming the government would help make the defense case for him.

To show prejudice, Goodman points out that his first trial, in which Retzlaff testified, ended in a hung jury. The government counters that Goodman was not prejudiced by counsel's alleged deficiencies because, unlike the first trial where only one accomplice and the store manager testified, by the time of the second trial, three confessed accomplices and the manager testified against Goodman. The Wisconsin Court of Appeals agreed that the error was harmless, reasoning that "even if the witness had testified in the second trial, it would have had no effect on the outcome of the trial because the victim and all three accomplices identified Goodman as the robber."

However, the cumulative effect of trial counsel's errors sufficiently undermines our confidence in the outcome of the proceeding. Rather than evaluating each error in isolation, as did the Wisconsin Court of Appeals, the pattern of counsel's deficiencies must be considered in their totality. *Washington*, 219 F.3d at 634-35 ("Evaluated individually, these errors . . . may not have been prejudicial to Washington, but we must assess 'the totality of the omitted evidence' under *Strickland* rather than the individual errors."). In weighing each error individually, the Wisconsin Court of

---

[4] Federal Rule of Evidence 804(b)(1) provides that, by exception to the hearsay rule, former testimony of an unavailable witness is admissible if it is "[t]estimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination."

Appeals overlooked a pattern of ineffective assistance and unreasonably applied *Strickland*.

The details of the robbery were largely undisputed at trial; thus, the case centered on the identification of Goodman as the assailant and, crucially, witness credibility. Three confessed accomplices testified against Goodman; but their credibility is questionable, given their incentive to curry favor with the government regarding their own fate. "Where the state's case consists chiefly or solely upon the word of an accomplice . . . courts have recognized the great importance to the defendant of evidence of direct contradiction or material corroboration from other sources." *Montgomery v. Petersen*, 846 F.2d 407, 413-14 (7th Cir. 1988). In *Montgomery*, we held that, in a swearing match regarding the defendant's participation in a burglary, counsel's failure to present testimony of a disinterested store clerk was deficient and prejudicial error under *Strickland*. *Id.* at 414-15. Here too, the testimony of a disinterested eyewitness was a crucial aspect of Goodman's defense. Retzlaff, who chose another individual as the robber, was undoubtedly important to creating reasonable doubt in the state's case against Goodman. Yet, the jury did not have the benefit of Retzlaff's testimony because Goodman's lawyer made no efforts to secure her presence at trial.

Counsel's failure to subpoena store cashier Retzlaff was only the first in a catalog of errors. Several other factors contributed to the overall ineffectiveness of Goodman's counsel. Direct examination of Goodman led to the revelation of two prior convictions for armed robbery on cross-examination. Counsel also failed to request an instruction limiting the use of testimony regarding threats made to witnesses, where jurors may have been left with the impression that the threats were orchestrated by Goodman, despite the lack of any evidence to that effect. Nor did counsel make any record of the fact that Ross hoped to receive a time reduction for his testimony, and counsel

did not object when the prosecutor insinuated in closing argument that Ross had no motivation to testify. Finally, Goodman's counsel did not object or request a mistrial when the prosecutor augmented Sallis's credibility by falsely arguing in closing that Sallis could not have been convicted or charged for his role in the crime absent his own confession. While each of these errors considered in isolation may not have been prejudicial to Goodman, viewed in their totality, they create a clear pattern of ineffective assistance, the existence of which "l[ies] well outside the boundaries of permissible differences of opinion." *Hardaway*, 302 F.3d at 762.

Given the totality of the evidence before the jury, *see Strickland*, 466 U.S. at 698, there is a reasonable probability that the outcome would have been different absent counsel's deficient conduct. Therefore, assuming the Wisconsin Court of Appeals applied the correct legal standard (which we believe it did not), its decision is nonetheless an unreasonable application of the Supreme Court's decision in *Strickland v. Washington*. Goodman's counsel's performance fell below the constitutional minimum guaranteed in the Sixth Amendment.

## III.  CONCLUSION

Accordingly, the judgment of the district court to deny Goodman's application for a writ of habeas corpus under § 2254(d)(1) is reversed and remanded for the entry of an order granting the writ. The State shall retry Goodman within 120 days or, failing that, he is entitled to be released.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*