In the

# United States Court of Appeals

## For the Seventh Circuit

No. 19-3158

JOHN MYERS,

*Petitioner-Appellee,*

*v.*

RON NEAL,

*Respondent-Appellant.*

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:16-cv-2023 — **James R. Sweeney, II**, *Judge.*

ARGUED MAY 26, 2020 — DECIDED AUGUST 4, 2020
AMENDED SEPTEMBER 16, 2020

Before FLAUM, SCUDDER, and ST. EVE, *Circuit Judges.*

SCUDDER, *Circuit Judge.* Indiana University student Jill
Behrman went for a bike ride one morning but never re-
turned. The police later found her bicycle less than a mile
from the home of John Myers II, on the north side of Bloom-
ington. Two years later a woman named Wendy Owings came
forward confessing to the murder, but the case was reopened
when a hunter came upon Behrman's remains far from the

location Owings described. A renewed investigation led the authorities to Myers, who was eventually charged with the murder. Six years after Behrman's disappearance, a jury convicted him. Multiple Indiana courts affirmed. Myers then sought relief in federal court, and the district court granted his application for a writ of habeas corpus, concluding that Myers's counsel performed so deficiently at trial as to undermine confidence in the jury's guilty verdict. We reverse.

The district court was right about the performance of Myers's trial counsel. It was deficient and plainly so in at least two ways. What leads us to reinstate Myers's conviction, though, is the strength of the state's case against him separate and apart from those errors. Among the most convincing evidence were the many self-incriminating statements that Myers made to many different people, like telling his grandmother that, if the police ever learned what he did, he would spend the rest of his life in jail. The weight of these statements, when combined with other evidence, leads us to conclude that his counsel's deficient performance did not prejudice him. The proper outcome is to respect the finality of Myers's conviction in the Indiana courts.

## I

### A. The Murder and Investigation

Jill Behrman disappeared during a morning bicycle ride on May 31, 2000. Local authorities and the Bloomington community sprung to action with assistance from volunteer search groups, neighboring police forces, state authorities, and eventually the FBI. The police established the timeline of that morning: Behrman, a skilled cyclist, planned to go for a ride before starting work at noon at the University's Student

Recreational Sports Center. She logged off her computer at 9:32 a.m. at her parents' house, which was close to the center of town. Two people reported seeing Behrman's bike lying by the road near farmland northwest of Bloomington at some point around noon that day. Nobody could locate her, though.

Initial leads pointed quite literally in different directions. Which way Behrman rode her bike that morning was one of the unsolved questions in the investigation and became a focus of the eventual trial. Everyone agreed that she started her ride from her parents' house in Bloomington. Whether she rode north or south was what mattered. Behrman's riding north was important to the theory the state would present at trial because it placed her near the home of John Myers. But some early leads suggested that Behrman rode south that morning. The Appendix contains a map with markings of the locations pertinent to the case.

Myers lived about a mile from where Behrman's bike was found on North Maple Grove. Given this proximity, Bloomington Detective Rick Crussen interviewed him on June 28, 2000. Myers stated that he had been on vacation the week of Behrman's disappearance. He added that he had been "here and there" but mainly at home because his plans to take a trip with his girlfriend Carly Goodman had fallen through. While checking Myers's explanations, the authorities learned that his relationship with Goodman, a high school senior at the time, ended a few weeks earlier than he had described. Goodman also told the police that she had no plans to go anywhere with Myers.

In 2002, a woman named Wendy Owings came forward and confessed to Behrman's murder. Owings, a Bloomington

resident, was facing unrelated felony charges when authorities interviewed her and asked her whether she knew about the Behrman disappearance—which by then was widely known around town. Owings faced up to 86 years' imprisonment and believed she could benefit by cooperating and confessing to the murder. Owings then decided to lie to the police, thinking that falsely admitting to the murder would mean less jail time. She did so by concocting the story that she and two friends were driving and using drugs when they accidentally hit Behrman on her bicycle. Owings said that the collision took place on Harrell Road on Bloomington's south side, roughly 20 miles from where Behrman's bike was found. To cover up the accident, Owings explained, they loaded Behrman's body into their car, wrapped her in a plastic sheet secured with bungee cords, stabbed her, and dumped her body in Salt Creek. Investigators were able to corroborate some of Owings's information: they drained the creek and found a knife, plastic tarp, and bungee cords. Although Behrman's body was not recovered, the police closed the investigation into her disappearance.

Nearly three years after Behrman's disappearance, in March 2003, a father and son hunting in the woods north of Bloomington came across a human jawbone. The woods were about 20 miles north of where Behrman's bike was found. The authorities and a forensic expert surveyed the scene and collected other skeletal remains. They determined based on dental records that the remains belonged to Jill Behrman. Recognizing her story no longer added up, Owings recanted her confession and admitted to lying about the murder in hopes for leniency on other charges.

The authorities reopened the investigation after Owings's recantation, but no meaningful breakthrough occurred until 2004. It was then that Detective Rick Lang turned his focus to Myers based on unexpected information provided by Myers's own family. His grandmother Betty Swaffard came forward and told the authorities that Myers had made a series of suspicious and incriminating comments about Behrman's disappearance. Others also reported incriminating statements Myers made to them about the case. His former girlfriend, Carly Goodman, likewise informed the police about a time Myers took her to the approximate location in the woods where Behrman's remains were later found. These developments led the state to conclude it had enough evidence to bring charges. In April 2006 a grand jury indicted Myers for the murder of Jill Behrman.

## B.  The Trial

### 1.  Opening Statements

Trial began on October 16, 2006. In its opening statements, the prosecution highlighted Myers's many incriminating statements, focusing especially on his grandmother who felt compelled to alert the authorities despite strong feelings of family loyalty. The state's theory hinged on Behrman riding her bike along a northern route on North Maple Grove near Myers's home, which the state said they would prove by presenting bloodhound scent evidence.

Defense counsel opened by suggesting Myers had an alibi: the morning that Behrman disappeared, Myers made phone calls from the landline in his northside home at 9:15, 9:17, 9:18, 10:35, and 10:47 a.m. That timing, defense counsel suggested, rendered Myers's involvement impossible if Behrman rode

her bike not north (in the direction of Myers's home) but instead to the south along Harrell Road. The officers involved in the first investigation considered that route possible after speaking to one of Behrman's classmates and to Wendy Owings, both of whom said they saw Behrman on that road on the day she disappeared.

Myers's counsel also used his opening statement to offer the jury two alternative suspects for the murder. The first was Wendy Owings, the person who confessed to the murder but later recanted her story after the police recovered Behrman's remains in a different place than she had identified. Defense counsel alternatively sought to place blame on Brian Hollars, a Bloomington resident who worked with Behrman at the Student Recreational Sports Center. But in contending that Hollars was responsible for Behrman's murder, defense counsel made certain misrepresentations. He promised the jury evidence that Hollars and Behrman were romantically involved and were seen fighting the day before she disappeared. Counsel also represented that a bloodhound followed Behrman's scent in the direction of Hollars's house but that an officer stopped the dog before it could reach the front door. All of those promises rang hollow, as defense counsel never presented any such evidence.

## 2. The State's Case Against Myers

The evidence presented during the first few days of trial focused on how Behrman's remains were uncovered, identified, and analyzed. Then the state presented evidence about her cycling habits and movements the day she disappeared. Brian Hollars testified for the prosecution, described Behrman's work at the recreational center, and offered an alibi by

informing the jury that he was at work the day of the disappearance. His testimony was not meaningfully challenged.

As the state promised, it presented evidence supporting its theory that Behrman rode north on North Maple Grove, near Myers's home. Foremost, the state presented evidence showing the location at which Behrman's bike was found. Deputy Charles Douthett, who conducted a search with his bloodhound several days after the disappearance, likewise testified that the dog tracked Behrman's scent along parts of the northern route. The dog alerted to Behrman's scent not only in the general direction of Brian Hollars's home but also near the location of her bike and indeed even a touch north in the direction of Myers's home. The jury heard no evidence that the bloodhound tracked Behrman to Hollars's doorstep as defense counsel told the jury in his opening statement.

The state's witnesses also included members of Myers's own family. His mother recounted for the jury a time in 2001 when Myers returned from fishing in the woods and reported finding a "bone" and "panties." Myers's aunt Debbie Bell testified that two months before Behrman's disappearance, Myers called asking for help watching his daughter because he needed time alone. Bell told the jury she remembered Myers pointing to problems with his girlfriend Carly Goodman and saying that he "felt like he was a balloon full of hot air ready to burst." She also described Myers's demeanor on the day Behrman disappeared, recalling that he showed up at his parents' home crying and saying he was leaving town.

Myers's grandmother Betty Swaffard testified despite what she described as conflicting feelings of family loyalty. She told the jury that early on Myers said he was a suspect in Behrman's disappearance and was afraid to drive past the

police roadblocks near his home. She further recounted Myers's statements four years later in 2004, when he called and asked her to take care of his daughter. He explained that he needed time to himself because he had "a lot of things" to think about. When Swaffard asked what was wrong, Myers said that "if the authorities knew" what he had done he would "be in prison for the rest of [his] life." As he dropped off his daughter, Myers was crying and told his grandmother that he wished he "wasn't a bad person" and that he hadn't "done these bad things." Defense counsel did not meaningfully cross-examine these family members.

The state also presented evidence about Myers's unusual behavior around the time of Behrman's disappearance. The jury heard, for example, a neighbor explain that Myers had covered the windows of his trailer and moved his car on the day Behrman went missing. Myers said he parked elsewhere so nobody could see he was home.

Nine additional witnesses testified that Myers brought up Behrman's disappearance—sometimes in highly inculpatory terms—between 2000 and 2006. One of those witnesses was the husband of Myers's cousin, who recalled him saying at a family gathering in late 2001 that he bet Behrman's body would be found in the woods.

Another witness, Myers's former coworker Dean Alexander, told the jury that while out on a furniture delivery, Myers asked him if he had heard about the Behrman case. Myers proceeded to point out where Behrman's bike was found and said that he had been questioned by police a couple of times because he lived close by. Alexander also told the jury that Myers then went further and, while driving north, gestured out the window and said, "if he was ever going to hide a body,

he would hide it up this way in a wooded area." The state also called Kanya Bailey, a former girlfriend of Myers, who said that in 2000 or 2001, he pointed to the spot where Behrman's bike was found and told her that *he* was the one who found it.

The state presented further testimony from John Roell, who was in jail for a petty offense and shared a cell with Myers for two days in May 2005. Roell recounted for the jury certain statements Myers made about Behrman. More specifically, Roell came forward to authorities to report that Myers brought up the Behrman case and mentioned her bicycle three or four times. Roell described how Myers paced nervously about the cell, appeared to be angry, once referred to a woman—who Roell believed was Behrman—as a "bitch," and said that "if she wouldn't have said anything, this probably . . . none of this would have happened."

Myers's former girlfriend Carly Goodman also testified for the prosecution and told the jury about the time in March 2000 when Myers drove her to a clearing in the woods north of Bloomington. Six years later, Detective Lang drove her back to the same general area and, without prompting, Goodman stated that she recognized the area as the location where Myers had taken her before. That area was less than one mile from where the Morgan County hunter found Behrman's remains. On cross-examination Goodman acknowledged that she had little explanation for how she recognized that clearing compared to any other.

Additional evidence supporting the prosecution's theory came from pathologist Stephen Radentz. He testified that Behrman had been killed by a shotgun wound to the back of the head. He also opined that the physical evidence surrounding the scene, including the failure to locate any clothing, led him

to conclude that Behrman was raped before she was murdered.

A firearms expert also testified and explained that the murder weapon, which was never recovered, likely was a 12-gauge shotgun. The state presented testimony from Myers's brother, who explained that he kept a 12-gauge shotgun at his parents' house but noticed the gun was missing when he moved home for a month in June 2000.

### 3.  The Defense Case

The defense called only two witnesses. The first was Gary Dunn, the FBI investigator who led the initial inquiry into Behrman's death and considered seriously the possibility that she had biked along a southern route away from Myers's home. After Dunn stepped down, defense counsel admitted being unprepared to call their next witness because they "didn't anticipate having to put on [their] case this early"—the state had rested its case earlier than the trial schedule anticipated.

Jason Fajt, an officer responsible for processing physical evidence in the case, also testified. Fajt presented books about pregnancy and reproductive health found in Behrman's bedroom, presumably to bolster the defense's theory that Behrman had a relationship with Brian Hollars and became pregnant with his child. Fajt also showed the jury the tarp, knife, and bungee cords found in Salt Creek that were consistent with the confession that Wendy Owings later recanted.

### 4.  Closing Arguments

The state used its summation to argue that the trial evidence exposed two of Myers's obsessions: his ex-girlfriend Carly Goodman and Behrman's bicycle. The prosecutor

reminded the jury of the many witnesses who described My-
ers's statements about Behrman's bike. The state likewise em-
phasized Myers's statements to his grandmother and aunt,
urging the jury to see them as confessions to the murder.

The state also described Myers's activities the morning of
the murder, painting his calls to various parks and drive-in
movies as a "last-ditch effort to get [his girlfriend] Carly back"
and explaining that he was "trying to get control back" over
her. The state connected the two apparent obsessions by es-
tablishing a motive: Myers wanted to control Goodman but
could not, so instead he took Behrman, who was merely in the
wrong place at the wrong time, to the same clearing in the
woods where he had driven Goodman. Based on the evi-
dence, the state argued, Myers's need to control women mo-
tivated what Dr. Radentz called a "classic rape homicide."

On the defense side, Myers's counsel followed up with a
watered-down version of his original theory, since much of it
had been discredited during trial. Defense counsel reempha-
sized Myers's alibi and that the evidence about which way
Behrman rode was a wash. He touched on the Wendy Owings
theory and posited that the physical evidence did not rule out
a stabbing.

When it came to Brian Hollars, counsel shied away from
his original theory. He still suggested that Behrman might
have been murdered because she was pregnant, a theory he
gleaned from books about the topic and contraception found
in her bedroom. But counsel said that the person responsible
for the murder could have been Hollars "or maybe it was an-
other man entirely." The defense also noted that Myers had
no clear motive for the murder and stressed the lack of phys-
ical evidence connecting him to it.

The jury deliberated for less than two hours and returned a guilty verdict. The trial court later sentenced Myers to 65 years' imprisonment. The Indiana Court of Appeals affirmed Myers's conviction and sentence on direct review. See *Myers v. State*, 887 N.E.2d 170 (Ind. Ct. App. 2008). The Indiana Supreme Court then declined review. See *Myers v. State*, 898 N.E.2d 1228 (Ind. 2008) (unpublished table decision).

## C. Requests for Postconviction Relief in State Court

Myers began his quest for postconviction relief by filing a petition in the trial court alleging that his counsel had performed so ineffectively at trial as to violate the Sixth Amendment. To support his petition, Myers pointed to an order of the Indiana Supreme Court finding that defense counsel, Patrick Baker, had engaged in professional misconduct during the trial, and suspending his license to practice for six months. See *In re Baker*, 955 N.E.2d 729 (Ind. 2011). The Indiana Supreme Court found that Baker breached his ethical duties not only by making false promises to the jury during his opening statement, but also by improperly soliciting Myers as a client and then falsely promising to represent him free of charge.

While Myers alleged multiple instances of ineffective assistance in his state postconviction petition, three specific errors came to form the focus of his request for relief:

> 1. *False promises*: Counsel's broken promises to the jury in his opening statement destroyed his credibility and left jurors confused about his theory of defense.

> 2. *Bloodhound evidence*: Counsel's failure to object to unreliable bloodhound evidence allowed the jury to conclude that Behrman

traveled near Myers's home, providing him the opportunity to commit the murder.

3. *Rape testimony*: Counsel failed to object to Dr. Radentz's testimony that the circumstances around Behrman's murder suggested she was raped. And that testimony allowed the jury to find a sexual assault motive, which was unfounded and resulted in severe prejudice.

The Indiana trial court denied relief. It noted that defense counsel did make misrepresentations during his opening statement but said that they did not affect the trial's outcome because the judge instructed the jurors not to base their decision on the statements and arguments of counsel. The trial court also rejected all of Myers's other contentions that his counsel performed deficiently at trial.

The Indiana Court of Appeals affirmed the denial of post-conviction relief. See *Myers v. State*, 33 N.E.3d 1077 (Ind. Ct. App. 2015). The court evaluated Myers's three primary contentions of ineffective assistance of counsel this way:

1. *False promises*: The court found deficient performance because defense counsel knew or should have known that no evidence supported his contentions that a bloodhound detected Behrman's scent at Hollars's home. (The court did not address counsel's false promise about evidence showing that Hollars and Behrman were seen fighting the day before her disappearance.) The false promise about the bloodhound evidence did not

result in prejudice, however, as defense counsel was able to present some evidence suggesting the possibility that Hollars had a romantic interest in Behrman. That evidence, the court reasoned, came from Behrman's cousin, who testified that some unidentified "older man" had asked Behrman out on a date.

2. *Bloodhound evidence*: Though defense counsel testified at the postconviction hearing that he did not remember ever researching the admissibility of bloodhound evidence, the court concluded that Myers failed to overcome the presumption that counsel's choice not to object to the evidence was strategic. Finding no deficient performance on this score, the court never reached the prejudice question.

3. *Rape testimony:* The court forwent a deficient performance analysis and concluded that Baker's failure to object to the testimony from Dr. Radentz did not prejudice Myers at trial. The court determined that counsel successfully cross-examined Dr. Radentz and elicited the acknowledgment that his conclusion about rape was not based on any physical evidence from Behrman's remains.

Before denying relief, the state appellate court paused to address Myers's contention that counsel's errors, when aggregated, affected the jury's decision and thereby amounted to ineffective assistance of counsel. The court underscored its

finding that Myers had failed to show even one instance of his counsel performing deficiently in a way that resulted in prejudice. Without even one error to point to, the court reasoned, there was nothing to aggregate as part of any cumulative prejudice analysis.

The Indiana Supreme Court again declined review. See *Myers v. State*, 40 N.E.3d 858 (Ind. 2015) (unpublished table decision). It was then that Myers sought postconviction relief in federal court.

### D. District Court's Award of Federal Habeas Relief

In a 146-page opinion, the district court focused much of its analysis on what it found were three serious errors committed by Myers's trial counsel: making false promises regarding the Brian Hollars evidence during opening statements, not objecting to the bloodhound evidence, and failing to preclude Dr. Radentz's testimony about Behrman likely being raped. *Myers v. Superintendent, Indiana State Prison*, 410 F. Supp. 3d 958, 981, 991, 1016 (S.D. Ind. 2019).

Turning to prejudice, the district court determined that the Indiana Court of Appeals, as the last court to have considered the merits of Myers's ineffective assistance claim, considered each allegation of ineffective assistance in isolation, rather than focusing on their cumulative effect. See *id*. at 1021–23. The failure to consider the combined effect of the errors, the district court concluded, amounted to an unreasonable application of the clearly established direction the Supreme Court provided in *Strickland v. Washington*, 466 U.S. 668 (1984). See *id*.

From there the district court found that "no fairminded jurist could conclude that trial counsel's cumulative errors did

not meet *Strickland*'s prejudice standard." *Myers*, 410 F. Supp. 3d at 1054. The court underscored that, while the state's evidence was sufficient to convict Myers, "it is far from a strong case of guilt" and, as a result, "the prejudice caused by trial counsel's errors more likely impacted the verdict." *Id*. at 1034. Indeed, the district court found that the "cumulative impact of trial counsel's errors was devastating to Mr. Myers's defense." *Id*. at 1050. The court granted habeas relief on that basis.

## II

While this appeal owes some of its complexity to the federal habeas corpus framework, the proper starting point is familiar. To evaluate a claim of ineffective assistance of counsel, we apply the standard the Supreme Court announced in *Strickland v. Washington* and ask whether defense counsel's performance was deficient and resulted in prejudice. 466 U.S. at 687. The deficient performance prong requires that the defendant show that his counsel's errors were so far below the level of competent representation that it was as though he had no counsel at all. See *id*. On the prejudice prong, the defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

That hill is even steeper for issues that the state court decided on the merits. Through its enactment of the Antiterrorism and Effective Death Penalty Act of 1996, Congress has allowed a federal court to award habeas relief to those like John Myers convicted of crimes under state law only if the state court's ruling "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or "was based on an unreasonable

determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2). This is no easy task. See *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the federal habeas standard as "difficult to meet" and "highly deferential"). The deferential standard reflects Congress's decision to require federal courts to afford substantial respect to the interests of comity and finality embodied in state court judgments of conviction.

By its terms, however, so-called AEDPA deference does not apply to federal claims that the state court did not address on the merits. See 28 U.S.C. § 2254(d) (providing that the deferential standard of review applies to "any claim that was adjudicated on the merits in [s]tate court proceedings"). When a state court reaches only one part of *Strickland*'s two-pronged analysis, we review the unaddressed prong *de novo*. See *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (reviewing *de novo* whether the defendant was prejudiced for purposes of the *Strickland* analysis because the state court did not reach the issue).

## A. Deficient Performance

We agree with the district court that defense counsel's performance fell short of "the legal profession's objective standards for reasonably effective representation." See *Anderson v. Sternes*, 243 F.3d 1049, 1057 (7th Cir. 2001) (citing *Strickland*, 466 U.S. at 687–88). We reach that conclusion whether we evaluate counsel's performance *de novo* or by affording the Indiana Court of Appeals's assessment the deference prescribed by § 2254(d)(1).

*False promises.* Defense lawyers often argue for acquittals on the basis that the authorities charged the wrong person.

Myers's counsel sought to do just that but went too far. Counsel promised to present evidence that Brian Hollars killed Behrman, even though he had to know he could not follow through on that promise at trial. No evidence supported the promises to prove that a bloodhound tracked Behrman's scent to Hollars's home or that Hollars was seen arguing with Behrman a day or two before she disappeared. Without such evidence, counsel's promises went unfulfilled. Making false promises about evidence in an opening statement is a surefire way for defense counsel to harm his credibility with the jury. See *United States ex rel. Hampton v. Leibach*, 347 F.3d 219, 257 (7th Cir. 2003). The state wisely concedes that Myers's counsel's false promises are indefensible—a clear instance of deficient performance.

*Bloodhound evidence.* The analysis is not as straightforward with Myers's contention that his counsel should have objected to the testimony that a bloodhound tracked Behrman's scent along a northern route and ultimately to the location of where her bike was found. The prosecution used this evidence to put Behrman—not just her bike—in north Bloomington, near Myers's home. Myers's counsel may have thought that it was more difficult to assign blame to Hollars without evidence putting Behrman in north Bloomington the morning of her disappearance.

But the district court was right in its observation that counsel so passively allowing the bloodhound evidence all but guaranteed the jury would not credit Myers's alibi that he was at home making telephone calls on a landline for a good part of the morning when Behrman disappeared. And the district court was equally correct that, at the very least, defense counsel should have investigated the admissibility of bloodhound

evidence and made an informed decision about whether to seek its exclusion. We, too, are troubled by counsel's acknowledgment at the postconviction hearing that he did not recall doing anything to assess the admissibility of the bloodhound evidence. Plain and simple, counsel missed the issue.

In these circumstances, we are inclined to agree with the district court that counsel's failure to object amounted to deficient performance and that the Indiana Court of Appeals's conclusion to the contrary was unreasonable, as it assumed without any evidentiary foundation in the record that counsel's failure to object reflected a considered and reasonable strategic decision. See *Strickland*, 466 U.S. at 690–91 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."); *Wiggins*, 539 U.S. at 521 (emphasizing the same point).

*Rape testimony.* Perhaps the starkest example of deficient performance came from counsel's failure to object to testimony stating that the circumstances around the murder were consistent with Behrman being raped before she was killed. Dr. Radentz, a forensic pathologist, investigated Behrman's remains and the scene surrounding their recovery and concluded that the cause of death was a "shotgun wound to the back of the head." That conclusion alone presented an obstacle for Myers's theory that Wendy Owings's recanted confession (that she ran over Behrman with her car, stabbed her to death, and then dumped her body in Salt Creek) was in fact true. But Dr. Radentz also testified that Behrman's remains

being found in a remote place without any clothing suggested that she was raped.

In state postconviction review, the Indiana Court of Appeals did not consider whether the failure to object to Dr. Radentz's testimony reflected deficient performance, preferring instead to take the permissible course of going straight to *Strickland*'s prejudice prong. See *Strickland*, 466 U.S. at 697 ("[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies."). That analytical route has a consequence for our review of Myers's request for federal habeas relief: we lack any state court determination on the deficient performance prong to which to review or defer under § 2254(d)(1). See *Quintana v. Chandler*, 723 F.3d 849, 853 (7th Cir. 2013) ("[W]hen a state court makes the basis for its decision clear, [§] 2254(d) deference applies only to those issues the state court explicitly addressed.") (citing *Wiggins*, 539 U.S. at 534). Our review therefore proceeds *de novo*.

Having taken our own fresh and thorough look at the trial record, we conclude without hesitation that defense counsel's failure to object to Dr. Radentz's testimony was "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Counsel provided no explanation for this failure, and our role is not to search for one to excuse his deficient performance. See *Wiggins*, 539 U.S. at 526–27; *Brown v. Sternes*, 304 F.3d 677, 691 (7th Cir. 2002).

While the Indiana Court of Appeals was right to note that defense counsel did manage to elicit acknowledgment from Dr. Radentz that he could not prove Behrman was raped, the observation only goes so far. Defense counsel himself was

responsible for provoking the testimony most harmful to My-
ers. On direct examination, Dr. Radentz raised only the possi-
bility of a rape-homicide and even then only in passing. But it
was defense counsel's imprecise and prolonged questioning
on cross-examination that allowed Dr. Radentz to underscore
his certainty that a rape occurred. Indeed, in response to de-
fense counsel's questions, Dr. Radentz testified that he consid-
ered the case "a rape homicide and dumping until proven
otherwise."

Preventing the jury from hearing a word about a rape mo-
tive should have been a priority for counsel. Everyone should
agree that the introduction of evidence of sexual violence, es-
pecially in a case where a young college student went missing
and later turned up dead, can be prejudicial. See *House v. Bell*,
547 U.S. 518, 541 (2006). And in prosecuting Myers, the state
did not use Dr. Radentz's testimony solely to explain where
and how Behrman was murdered. It instead relied on the tes-
timony to support its theory of motive: that Myers raped Beh-
rman before shooting her as a display of his desire to control
women. Defense counsel should have sought to prevent My-
ers from being portrayed as a rapist.

In the end, we agree with the district court that counsel
performed deficiently. We turn now to whether any of coun-
sel's errors resulted in substantial prejudice to Myers.

## B. Prejudice

Errors are prejudicial when there is a "reasonable proba-
bility" that the trial would have come out differently without
them. *Strickland*, 466 U.S. at 694; see also *Cook v. Foster*, 948
F.3d 896, 908 (7th Cir. 2020) (explaining and applying the
same standard). "A reasonable probability," the Supreme

Court has explained, "is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. While the Supreme Court has avoided assigning a numerical probability to the inquiry, it has explained that the likelihood of a different result need not be "more likely than not" but nonetheless "must be substantial." *Harrington v. Richter*, 562 U.S. 86, 111–12 (2011).

Where, as here, the record shows more than one instance of deficient performance, the Sixth Amendment requires that we approach the prejudice inquiry by focusing on the cumulative effect of trial counsel's shortcomings. This direction comes from *Strickland* itself, where the Supreme Court instructed courts to "consider the totality of the evidence before the judge or jury." 466 U.S. at 695. "Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." *Id*. at 696.

We have read *Strickland* just this way—as mandating a cumulative assessment of prejudice—on at least five prior occasions. See, *e.g.*, *Harris v. Thompson*, 698 F.3d 609, 648 (7th Cir. 2012) ("The question is whether counsel's entire performance at the hearing prejudiced Harris. By analyzing each deficiency in isolation, the [state] appellate court clearly misapplied the *Strickland* prejudice prong."); *Sussman v. Jenkins*, 636 F.3d 329, 360 (7th Cir. 2011) (assessing the "cumulative impact" of counsel's two errors); *Goodman v. Bertrand*, 467 F.3d 1022, 1030 (7th Cir. 2006) (reversing the district court's denial of a § 2254 application because the state appellate court unreasonably applied federal law by "evaluating each error in isolation"

and not in their totality); *Washington v. Smith*, 219 F.3d 620, 634–35 (7th Cir. 2000) (explaining that the *Strickland* prejudice inquiry required an assessment of "the totality of the omitted evidence" and the other evidence presented to the jury); *Alvarez v. Boyd*, 225 F.3d 820, 824 (7th Cir. 2000) (explaining that the need to analyze errors together because their "synergistic" effects can make the "whole . . . greater than the sum of its parts").

The Indiana Court of Appeals did not undertake a cumulative prejudice inquiry. It instead relied on its assessment of each individual error in isolation and then reasoned that because no one error met each of *Strickland*'s two prongs, a cumulative analysis was unnecessary. The court defended its approach with sparse reasoning: "We have reviewed each of Myers' claims of error in detail and concluded that none of them amount to ineffective assistance of counsel." *Myers*, 33 N.E.3d at 1114. It then offered the view that "trial irregularities" cannot be combined to "gain the stature of reversible error." *Id*. (citing *Kubsch v. State*, 934 N.E.2d 1138, 1154 (Ind. 2010)). That legal observation is at odds with *Strickland* itself and our prior conclusions.

In these circumstances, where the state habeas court has not conducted a cumulative prejudice analysis, we must undertake the inquiry on our own in the first instance. See *Goodman*, 467 F.3d at 1030–31 (considering the impact of counsel's errors in light of the strength of the other evidence presented to the jury *de novo* and therefore without deference to the state court's findings).

It is here that we part ways with the district court. In evaluating the state's evidence against Myers, assessing defense counsel's errors, and projecting how the trial may have

proceeded differently absent those errors, the district court found itself lacking confidence in the jury's guilty verdict. The court emphasized the absence of physical evidence linking Myers to the murder and, even more generally, any proof of a prior connection between him and Behrman. And, as the district court saw it, the absence of such proof is what made Dr. Radentz's rape testimony so prejudicial to Myers, for it allowed the jury to assign a motive to what otherwise appeared an implausible crime. So, too, did the district court find that Myers suffered substantial prejudice when his counsel made no meaningful effort to show that Behrman rode her bike south (not north toward Myers's home) the morning she disappeared. That evidence would have been difficult for the prosecution to overcome, given the landline telephone records showing that Myers was home making calls that morning. And that point is why, in the district court's view, the bloodhound scent evidence mattered: it put Behrman close to Myers's home and doomed his alibi.

We see the evidence differently. Far from weak, the prosecution presented substantial evidence of Myers's guilt. The district court failed to appreciate that, when taken together, the evidence of Myers's guilt overwhelmed any prejudicial effect of defense counsel's failings. The weight of the state's case against Myers prevents him from showing that he suffered substantial prejudice from his trial counsel's errors. See *Strickland*, 466 U.S. at 696 ("[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support."); *Cook*, 948 F.3d at 909 (emphasizing the same point).

To be sure, counsel's deficient performance undoubtedly had some impact on the trial. The most troubling aspect of

counsel's deficient performance—failing to object to Dr. Ra-dentz's testimony that Behrman was raped before she was murdered—allowed the state to supply the jury with a theory of motive. The state made the point as plain as day in its clos-ing argument: "You know the motive in this crime is clear . . . when Doctor Radentz told you that this was a classic rape murder. Rape is a crime of control. Rape is not a sex crime. It is pure and simple control over another human being and dominating them." The state used Dr. Radentz's opinion to underscore the narrative that Myers, while reeling from his breakup with Carly Goodman, had a need to control people, especially women.

But even without the testimony about rape, the state painted that picture about Myers through other means. The jury heard testimony showing that Myers lost his girlfriend, Carly Goodman, and had no luck trying to restore the rela-tionship, including by unexpectedly showing up at her senior class trip and trying to join her at an amusement park in Lou-isville before being turned away. The jury also heard from John Roell, who shared a cell with Myers in May 2005, that Myers spoke about Behrman using degrading language and saying that nothing had to happen to her if she would not have said anything—statements evincing Myers's attempt to exert control over her. With all of this evidence, the state por-trayed a defendant who lost control of one relationship and committed a horrific crime as part of trying to exercise control over a young woman of a similar age.

As for counsel's false promises during his opening state-ment, we do not doubt that those damaged the theory of de-fense that Brian Hollars committed the murder. The jury never heard any testimony about a bloodhound alerting to

Behrman's scent near Hollars's home or any argument between Hollars and Behrman in the days before her disappearance.

Counsel's errors also weakened Myers's alternate theory that Wendy Owings committed the murder. Recall that when she confessed, Owings said that she hit Behrman on Harrell Road on the south side of Bloomington. But by not objecting to the bloodhound evidence, counsel let the state provide support for its theory that Behrman rode her bike in the opposite direction the morning she went missing, making Owings's involvement seem implausible, especially given the recanted and admittedly false confession.

In evaluating the whole trial picture, however, it becomes clear that the viability of the Hollars and Owings theories was significantly undermined for reasons other than counsel's mistakes. The Owings theory depended on Behrman riding south, but apart from the bloodhound scent testimony, the jury heard evidence that she rode in the opposite direction. Remember that Behrman's bike was found along North Maple Grove, less than a mile from Myers's home. Nothing about the bloodhound scent testimony changed that evidentiary obstacle for Myers. And from the outset, Hollars was not a serious suspect in the case. Indeed, the jury learned that the authorities initially considered Hollars due only to the admonitions from a psychic in Michigan.

Much more significant, the state called both Hollars and Owings to testify at trial. Owings explained in detail the pressure she felt from investigators and her own defense attorney to cooperate and confess to murdering Behrman since she was facing significant time on other charges. She also described how she formulated the fake story, in part by relying on her

childhood experiences swimming and fishing in Salt Creek. For his part, Hollars denied any involvement in Behrman's disappearance, described the very limited interactions he had with Behrman during her work at the Indiana University recreation center, and explained that he was at work on the campus the morning she disappeared.

Simply put, Myers could not compete with the testimony the prosecution presented from Owings and Hollars—evidence presented almost certainly to prove to the jury that the state had charged the right person with Behrman's murder. The testimony from Owings and Hollars diminished the strength of Myers's defense to a much greater extent than any prejudice that independently followed from counsel's failure to object to the bloodhound scent evidence or misleading opening statement.

So, while we are quick to acknowledge counsel's errors, we are confident that the defense theories that they impacted were sufficiently undermined, if not overwhelmed, by evidence presented at trial. Any impact from those errors on the jury's verdict pales in comparison to the strength of the evidence the state presented against Myers:

- Behrman's bike was found less than a mile from Myers's home;

- The very day Behrman went missing, Myers was seen crying and took steps to cover his windows with blankets and move his car to prevent anyone from knowing he was home;

- Myers took his girlfriend to the approximate location in the Morgan County woods where

a hunter later came upon Behrman's re-
mains;

- Myers had access to a 12-gauge shotgun like
  the one that the experts opined was used in
  Behrman's murder; and

- Myers made multiple self-incriminating
  statements to many different people, with at
  least one of those statements being tanta-
  mount to confessing to committing the mur-
  der.

The last point bears especially significant weight. The in-
criminating statements Myers made to so many different peo-
ple following Behrman's disappearance make all the differ-
ence in determining whether defense counsel's errors sub-
stantially affected the outcome of the trial. During an inter-
view with the investigators in 2005, he insisted that had not
discussed the Behrman case with anyone except law enforce-
ment—a position at extreme odds with much of the other tes-
timony that the jury heard. See *United States v. Rajewski*, 526
F.2d 149, 158 (7th Cir. 1975) ("It is well settled that untrue ex-
culpatory statements may be considered as circumstantial ev-
idence of the defendant's consciousness of guilt."). Myers put
himself front and center in the murder, conveying to many
people an obsession with Behrman's disappearance and
death and thereby thwarting a meaningful chance of a suc-
cessful defense at trial.

The list is long, so we will recap just a few of the most re-
vealing and inculpatory statements that Myers made. Just af-
ter Behrman went missing, Myers called his grandmother
Betty Swaffard and asked for $200, telling her that he was a

suspect in the case. Around the same time, he showed up at his parents' home crying and said he was leaving town and never coming back.

Swaffard's full testimony was devastating for Myers. She told the jury that in 2004 her grandson called her and said that he had "a lot of things [he] need[ed] to think about." He then went further and told her that if the authorities knew about the things on his mind he would "be in prison for the rest of [his] life." Later that night when he dropped his daughter off at Swaffard's house, he cried and told her that he wished he "hadn't done these bad things." Swaffard heard these statements as relating exclusively to Behrman, and, despite feelings of deep-seated family loyalty, felt compelled to come forward and share the information with the authorities.

Remember too that after Behrman's disappearance, Myers told his mother that he had been fishing in a creek in the woods and came upon a "bone" and "panties." He likewise told his cousin's husband (before the authorities recovered Behrman's remains) that he bet the police would find Behrman's body in the woods.

Aside from these statements to family members, the jury heard from an array of friends, acquaintances, and community members recalling similar comments. For example, Myers spoke frequently of the Behrman case and even aggrandized his role in it, like falsely telling his ex-girlfriend that he was the one who found Behrman's bike. Even more, he told his former coworker Dean Alexander during a discussion about Behrman that if he was going to hide a body, he would hide it up north in a wooded area. Myers's comment foreshadowed what happened over a year later—Behrman's remains were found in the woods just north of Bloomington.

And then there was John Roell, Myers's former cellmate who told the jurors that Myers brought up Behrman and her bicycle repeatedly, called her a "bitch," and said "if she wouldn't have said anything, this probably . . . none of this would have happened."

All of this testimony regarding the unsolicited statements that Myers made to those around him about Behrman's disappearance and murder went untainted by any of his trial counsel's errors and by any measure defeated his defense.

Our examination of the record leaves us of the firm conviction that even without counsel's errors, the jury would have reached the same conclusion and found John Myers guilty of murdering Jill Behrman. Because of the strength of the evidence presented at trial, our confidence in the jury's decision is not undermined. See *Lee v. Avila*, 871 F.3d 565, 571 (7th Cir. 2017) (finding no prejudice despite deficient performance when "the state's case was very strong" and made a different outcome "not reasonably probable"). Myers has fallen short of demonstrating what the Supreme Court has told us is essential to relief rooted in a claim of ineffective assistance of counsel—that the "likelihood of a different result must be substantial." *Richter*, 562 U.S. at 111–12.

We close by noting that the district court, while granting Myers relief based on the three instances of ineffective assistance of counsel analyzed in this opinion, acknowledged but did not definitively resolve other, lesser alleged instances of ineffective assistance. Our analysis of the strength of the state's evidence forecloses relief based on these other allegations of ineffective assistance. But we do remand for the sole purpose of allowing the district court to address the two claims Myers advanced under *Brady v. Maryland*, 373 U.S. 83

(1963), in his § 2254 application. The district court reserved judgment on these claims. Our conclusions regarding the strength of the state's evidence may well foreclose relief on those claims too, but the district court should assess the question in the first instance as neither party briefed the claims in this appeal.

We REVERSE the order granting Myers's petition for a writ of habeas corpus and REMAND for the sole and limited purpose of allowing the district court to consider the unresolved *Brady* claims identified above.

**Appendix**



*Map Source:* Indiana State Library, Indianapolis, IN

1. John Myers's home
2. Location where Jill Behrman's bike was found
3. Brian Hollars's home and location where one resident thought he saw Behrman cycling
4. Jill Behrman's home
5. Location where another resident thought she saw Behrman cycling and where Wendy Owings said she was driving

Not pictured: Jill Behrman's remains were found about 20 miles north of Point 2.